# Exhibit A





The Application for New Beverage Showdown 18 This December in Santa Monica is Open -- Apply to ...

# In the Courtroom: Craft Root Beer Maker Battles Monster

**Martín Caballero** | Apr. 4, 2017 at 3:35 pm

    

23
SHARES

**BEAST MEETS MONSTER**

A story in *The Washingtonian* chronicles how a Washington, D.C.-based craft root beer brand is turning the tables on Monster Beverage Corp. after the energy drink giant accused them of trademark violations.





Thunder Beast, which offers root beer in classic and seasonal varieties, as well as a ginger beer, operates from the TasteLab food incubator in northeast Washington, D.C. According to the article, published March 28, the company received a cease and desist letter from Monster Beverage roughly a year ago objecting to Thunder Beast's use of the word "beast" in its name.

While Monster prepared for trial, its lawyers let slip that they didn't have a case, and finally presented Thunder Beast founder Stephen Norberg with reasonable settlement terms.

Yet in a surprise move, Norberg rejected the settlement on moral grounds, telling *The Washingtonian* he is eager to have his day in court.

"I wanted to publicly defend so that when other small businesses get harassed by Monster Energy, they will be able to research this issue and see that they have a history of doing this and that it's possible and fairly easy for the underdog to stand up to these big corporate bullies and defeat them if you're in the right," he said.

Thunder Beast is raising money for legal fees associated with the case on its website, which contains a description of the case framing it as the story of an upstart entrepreneur who invested his life savings into his company being squeezed by a "known fat cat corporation" and "corporate bully." In a particularly effusive passage, the litigation is described as "a showdown of epic proportions between two mythical creatures locked in a vicious struggle to claim ultimate beverage supremacy."

**COCONUT WATER OR "COCONUT" WATER?**

Unique Beverage Company, makers of Cascade Ice sparkling waters, is facing class action litigation over allegations its coconut flavored sparkling water is deceiving to consumers.

According to a lawsuit filed in U.S. District Court in Washington in March, Vicky Silva, a consumer in Oregon, claims she was tricked into buying the brand's coconut flavored sparkling water when the product did not actually contain any coconut. Silva filed the complaint on behalf of all others similarly situated.

When Silva e-mailed Unique Beverage with her complaint, the company responded that its sparkling water are flavored with "all natural fruit essences."

The complaint alleges that Unique Beverage featured the word "coconut" and images of coconuts on the product's label when it contained "no coconut, no coconut water, no coconut juice, no coconut pulp, no coconut jelly, no coconut natural flavor, has no coconut health qualities, and does not taste like coconut."

Attorneys are asking the court to file an injunction requiring Unique Beverage to change the labels on its coconut sparkling waters to clearly indicate that the beverage does not contain coconut, as well as monetary damages for Silva and restitution for anyone in Oregon who purchased the coconut flavor Cascade Ice in the past year.

| COMPANIES | UNIQUE BEVERAGE COMPANY, LLC |
| --- | --- |

Company:
Unique Beverage Company, LLC

No description provided.

# A Tiny DC Soda Company Is Taking on Monster Energy

washingtonian.com/2017/03/28/tiny-dc-soda-company-taking-monster-energy/

By Julie Strupp

March 28, 2017



Photo credit: Thunder Beast

Thunder Beast, a small DC root beer company, is fighting trademark violation allegations from California-based Monster Energy Corporation. About a year ago, Thunder Beast, which operates out of the TasteLab food incubator in Northeast, received a cease-and-desist letter from Monster over the use of the word "beast" in the company name.

In its letter, Monster argued customers might accidentally buy one of Thunder Beast's bison-emblazoned beverages when they intended to buy an energy drink. Monster claims Thunder Beast infringes on its brand, which includes trademarked slogans such as "PUMP UP THE BEAST" and "UNLEASH THE ULTRA BEAST," its petition for cancellation reads.

"I did some research and found out [Monster] is a corporate bully when it comes to small businesses and trademarks, so I hired an attorney who had dealt with them before," says Thunder Beast founder **Stephen Norberg**. "For a long time we did this dance where they would suggest fairly ridiculous terms. For example, they wanted me to agree that we would never use the color green again in any capacity."

1/3

Monster initially insisted on going to trial, until its attorneys let slip that they'd finally looked at the Thunder Beast website and realized it didn't commit copyright infringement. The lawyers proposed a settlement, but Norberg turned it down.

"At the end of this I'd already spent so much time and money and done so much discovery work … that when they finally got around to giving me a settlement offer that was reasonable I decided to reject it," says Norberg. "I wanted to publicly defend so that when other small businesses get harassed by Monster Energy, they will be able to research this issue and see that they have a history of doing this and that it's possible and fairly easy for the underdog to stand up to these big corporate bullies and defeat them if you're in the right."

Trademarkia, an online patent- and trademark-filing service, called Monster Energy the biggest trademark bully of 2014, when it objected to 60 trademark applications by other companies. Larger firms have more marks to defend than smaller businesses, so it follows they would likely file more oppositions.

Monster Energy did not respond to a request for comment on its suit with Thunder Beast. Many of the companies who settled other cases with Monster Energy also signed nondisclosure agreements.

Still, a small-batch beverage company can be easily outmatched by a corporation that sells its products around the world. Thunder Beast is raising money for legal fees on its website, advertising their struggle with funny graphics and proclaiming, "Forget being the underdog. We're going full #UnderThunder."

"I really want to make it the DNA of my company to fight monsters, which is something I'm putting on all my new labels: Fight Monsters," Norberg says. "I think that's something that resonates with every human being, and it's something I want to use my company to inspire people to do."

2/3

Monster Energy Attempts To Run From Laughable Trademark Spat It Started With Thunder Beast Root Beer | Techdirt



« Pennsylvania Court Says Bloggers Protected By Journalist...    EU Plans To Weaken Encrypted Communications Despite ... »

## Monster Energy Attempts To Run From Laughable Trademark Spat It Started With Thunder Beast Root Beer



Trademark

from the *monster-hunting* dept
Thu, Mar 30th 2017 4:35pm — Timothy Geigner

Readers here will hear the name "Monster Energy Corporation", makers of the Monster Energy beverage, and likely immediately roll their collective eyes. Monster Energy has truly been a monster when it comes to trademark bullying over some of the most frivolous claims imaginable. From threats against breweries over location-based puns, to threats against beverage review sites it doesn't like, and even threats against an actor that featured in a *monster movie* over a photo he tweeted holding a Monster Energy drink, the company is something of a joke in trademark circles.

Which hasn't kept the company from continuing its bullying ways, of course. The latest version of its efforts concerns a startup root beer company in DC that dared to use the word "beast" in its name, with Monster Energy asserting that beast is too close to monster and oh my god why is this universe such a silly, silly place?

> Thunder Beast, a small DC root beer company, is fighting trademark violation allegations from California-based Monster Energy Corporation. About a year ago, Thunder Beast, which operates out of the TasteLab food incubator in Northeast, received a cease-and-desist letter from Monster over the use of the word "beast" in the company name.
>
> In its letter, Monster argued customers might accidentally buy one of Thunder Beast's bison-emblazoned beverages when they intended to buy an energy drink. Monster claims Thunder Beast infringes on its brand, which includes trademarked slogans such as "PUMP UP THE BEAST" and "UNLEASH THE ULTRA BEAST," its petition for cancellation reads.

Whereas many small companies might turn tail, Thunder Beast founder Stephen Norberg did his research and discovered that Monster Energy was a trademark bully of the silliest order. Instead of giving in, he hired a lawyer and decided to fight back. Monster didn't sue the company for infringement in federal court, but rather went to the US Patent & Trademark Office's Trademark Trial and Appeal Board (TTAB) seeking to get Thunder Beast's own trademark cancelled. Monster initially insisted it wanted a TTAB trial over all of this, but more recently said that looking at Thunder Beast's website showed that there was nothing about which to be concerned (seems a bit late to realize that). After stating that, Monster's lawyers reportedly *then* offered a settlement. Which doesn't make any sense, so Norberg's lawyer declined.

> "At the end of this I'd already spent so much time and money and done so much discovery work … that when they finally got around to giving me a settlement offer that was reasonable I decided to reject it," says Norberg. "I wanted to publicly defend so that when other small businesses get harassed by Monster Energy, they will be able to research this issue and see that they have a history of doing this and that it's possible and fairly easy for the underdog to stand up to these big corporate bullies and defeat them if you're in the right."

Oops. More than that, Norberg is using the company website to put all of this in front of its customers, to take donations for its legal defense fund, and to attempt to turn this whole ordeal into a positive by framing his business as one that "fights monsters." It's all actually fairly clever.

> Thunder Beast is raising money for legal fees on its website, advertising their struggle with funny graphics and proclaiming, "Forget being the underdog. We're going full #UnderThunder."
>
> "I really want to make it the DNA of my company to fight monsters, which is something I'm putting on all my new labels: Fight Monsters," Norberg says. "I think that's something that resonates with every human being, and it's something I want to use my company to inspire people to do."

### Follow Techdirt

### Techdirt Gear

COPYING IS NOT THEFT — T-SHIRTS, HOODIES, MUGS & MUCH MORE FROM TECHDIRT — SHOP NOW

### Advertisement

Report this ad   Hide Techdirt ads

### Essential Reading

### Hot Topics

**5.5** Elsevier Says It's Infringing To Link To Sci-Hub; Hypocrite Elsevier Links To Sci-Hub All The Time

**5.4** Reaping What They Sowed: Recording Industry Now Quite Upset About Copyright Run Amok

**5.2** White House Once Again Circulating A Draft Executive Order On Social Media Bias

### New To Techdirt?

*Explore some core concepts:*

Saying You Can't Compete With Free Is Saying You Can't Compete Period

If Intellectual Property Is Neither Intellectual, Nor Property, What Is It?

How Being More Open, Human And Awesome Can Save Anyone Worried About Making Money In Entertainment

read all »

### Techdirt Deals



9 COURSE BUNDLE   BUY NOW

It's the saga of many bullies: threats are made, the bully gets punched in the nose, then proceeds to run away. We'll see just how far Monster Energy elects to run from Thunder Beast, but if it's already proposing lenient settlements and even those aren't being accepted, a hasty retreat might be the best move.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

The Complete Learn to Code Master Class Bundle

Report this ad   |   Hide Techdirt ads

Techdirt Insider Chat

https://www.documentcloud.org/documents/6190005-PALANTIR-Guide.html
https://mobile.twitter.com/VirtueSecurity/status/11511(
https://imgur.com/gallery/9Y8WLBf

**Jeffrey Nonken**:
https://www.theregister.co.uk/2019/07/19/slow_internic

**Mark Harrill**: as an AHL season ticket holder, I never ever thought I'd see the AHL mentioned here, thanks for writing up that debacle it was entertaining

**Dark Helmet**: Heh, that one was fairly fun to write up, actually

**BentFranklin**: More good work by Barrett Brown https://www.counterpunch.org/2019/07/24/this-london-firm-helps-the-wealthy-hide-assets-or-steal-them-luckily-we-have-15-years-of-their-client-communications/

Join the Insider Chat

Advertisement

Which would you cl

  

With Amazon          With V
$52                      $

*prices found on 1/21*

wikibuy.

Report this ad   |   Hide Techdirt ads

**Recent Stories**

**Friday**

09:41  Reaping What They Sowed: Recording Industry Now Quite Upset About Copyright Run Amok (13)

06:37  White House Once Again Circulating A Draft Executive Order On Social Media Bias (46)

03:33  AT&T Employees Took Bribes To Plant Malware On Company's Network (5)

**Thursday**

20:02  Consumer Reports Finds Numerous Home Routers Lack Even Basic Security Protections (18)

16:11  Oops: Japan Anti-Piracy Proposals Probably Violate Its Constitution (12)

14:14  NYPD, Prosecutors Illegally Using Expunged Criminal Records To Perform Investigations, Ask For Longer Sentences (17)

12:16  Ring Is Teaching Cops How To Obtain Doorbell Camera Footage Without A Warrant (5)

10:44  Elsevier Says It's Infringing To Link To Sci-Hub; Hypocrite Elsevier Links To Sci-Hub All The Time (25)

10:39  Daily Deal: The Complete Raspberry Pi & Alexa A-Z Bundle (1)

09:35  North Carolina Court Says Retaliatory Arrests Over Protected Speech Are Cool And Legal (14)

More

Filed Under: **beast**, **monster**, **trademark**, **ttab**
Companies: **monster energy**, **thunder beast**

19 Comments  |  Leave a Comment

    

Advertisement

The lawsuit against Techdirt **has finally been settled.**

**Your contribution helps us recover from this legal battle.**

Donate to the **Techdirt Survival Fund**   $ [     ]   **DONATE**

Donations help us continue our reporting on First Amendment issues. Learn more about the Techdirt Survival Fund at
fund.techdirt.com

FEATURED VIDEOS

**Apple vs. Huawei: Who Is Winning the...**
Jul.29 -- Jun Zhang, managing director of Rosenblatt
Securities, discusses how Huawei Technologies Co....

*Report this ad*  |  *Hide Techdirt ads*

---

**If you liked this post, you may also be interested in...**

- Liverpool FC Also Apparently Attempted To Trademark Widely Used Chant By Football Fans
- The World's Most Ridiculous Trademark Dispute Is Now Over: Yosemite Gets Its Names Back
- Fans, Indie Soccer Clubs Slam Liverpool FC For Trying To Trademark 'Liverpool'
- Monster Energy Loses Trademark Opposition As UK IPO Mentions That The Letter 'M' Isn't Distinctive
- Monster Energy Loses Appeal On Monsta Pizza Trademark Ruling

---

## Reader Comments

View by: Time | Thread          Subscribe: RSS

 **That Anonymous Coward** (profile), *30 Mar 2017 @ 5:01pm*   

If only attempts to abuse your Trademark could result in you losing it.
One does wonder if companies would be so eager to pay lawyers that promise them total control over
everything, when the result could be losing the mark. It might even kill off some of the parasitic lawyers out
there who file what they know are pointless lawsuits just to get paid. It would work better than the alleged
oversight from inside the system.

[ reply to this | link to this | view in chronology ]

     **Roger Strong** (profile), *30 Mar 2017 @ 8:30pm*   

    **Re:**

       *If only attempts to abuse your Trademark could result in you losing it.*

    The test for that "abuse" is in losing the lawsuit. Think of what happens next.

    Corporations (they're people too!) would demand equal treatment. Anyone suing them and losing is by
    definition abusing the legal system and subject to punishment beyond just the legal fees.

    Corporations already have the upper hand through much larger legal funds. This would tip the balance
    further in their favor.

    [ reply to this | link to this | view in chronology ]

 **TechDescartes** (profile), *30 Mar 2017 @ 5:05pm*   

**All-You-Can-Pay Justice Buffet**

Unfortunately, the question is not how much justice you deserve. It's how much can you afford? Good for him
standing up to Monster.

[ reply to this | link to this | view in chronology ]

     **TechDescartes** (profile), *31 Mar 2017 @ 1:24pm*   

    **Re: All-You-Can-Pay Justice Buffet**

    BTW, Monster isn't proceeding on the basis of its "MONSTER" marks but on the basis of any entirely separate
    set of trademarks relating to the word "BEAST," as shown in the documents at the bottom of the post.

    The only likelihood of confusion I see in this story is Tim's objection over "Monster Energy asserting **that**
    **beast is too close to monster** and oh my god why is this universe such a silly, silly place?" Might want to fix
    that.

    [ reply to this | link to this | view in chronology ]

Case 5:18-cv-01367-AB-AS   Document 56-2   Filed 08/09/19   Page 9 of 68   Page ID #:3310



**Anonymous Coward**, *30 Mar 2017 @ 5:31pm*

Remember people: Think before you sue.

[ reply to this | link to this | view in chronology ]

**orbitalinsertion** (profile), *30 Mar 2017 @ 7:42pm*

And Monster (Cable, etc.) didn't imagine a trademark violation? Color me shocked. Someone might confuse a beastly root beer with some overpriced braided wire.

Oh, but Monster (Power) has already been down that road with Monster Energy (Hansen/Monster Beverage). No go again? Awww.

[ reply to this | link to this | view in chronology ]

**Bergman** (profile), *31 Mar 2017 @ 12:59am*

**Re:**

Given how Monster Energy™ tastes, I could totally see customer confusion of their product with Monster Cable™.

[ reply to this | link to this | view in chronology ]

**orbitalinsertion** (profile), *31 Mar 2017 @ 5:27am*

**Re: Re:**

I have no idea, but it certainly seems like that "drink" could be a petrochemical resin precursor. Good point.

[ reply to this | link to this | view in chronology ]

**Avatar28** (profile), *31 Mar 2017 @ 5:52am*

**Re: Re:**

Well, yeah, they're both made of crap so it makes sense they would taste similar.

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *31 Mar 2017 @ 4:19am*

**Re:**

And what about Monster Fishkeepers, an online forum for people who keep big aquarium fish?

[ reply to this | link to this | view in chronology ]

**orbitalinsertion** (profile), *31 Mar 2017 @ 5:40am*

**Re: Re:**

What? Bastards! You are so sued. I wanted to buy a drink and ended up lost in a forum full of nothing but fishwater. Damn this confusion.

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *4 Apr 2017 @ 2:19pm*

**Re: Re:**

And Monstera deliciosa. They'd better sue that plant!!!!

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *30 Mar 2017 @ 8:10pm*

Sad thing is unless Monster Energy truly does run with its tail between its legs so bad they pay up to make it go away, Thunder Beast is not going to see any of its costs for fighting this egregious bully recouped.

[ reply to this | link to this | view in chronology ]



**Narcissus** (profile), *31 Mar 2017 @ 2:57am*

**Reason to buy?**

Perhaps Thunder Beast could release a special limited edition of their beverage and sell it at a high price to add to their defense fund.

I suggest they call it "Beast beats monster!"

[ reply to this | link to this | view in chronology ]

**Roger Strong** (profile), *31 Mar 2017 @ 5:58am*

A couple years ago Triple Crown hopeful American Pharoah signed a deal with Monster worth over $7 million. Perhaps that was the "Beast" connection that Monster wanted to protect.

(If the horse didn't win the Triple Crown, it had a back-up deal with Arby's.)

[ reply to this | link to this | view in chronology ]

**JustMe** (profile), *31 Mar 2017 @ 8:39am*

**Donated!**

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *31 Mar 2017 @ 12:36pm*

**Hot story, sis.**

Or at least it's not cool and you're not my "bro".

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *31 Mar 2017 @ 3:00pm*

Shouldn't we be more concerned about the poisonous illegal crap that a certain drinks company MONSTROUSLY added to their black and green cans and tried to pretend never happened?

Or the bright green carcinogenic colorants they use despite it being banned (bribery plays a big part here)

[ reply to this | link to this | view in chronology ]

**Anonymous Coward**, *31 Mar 2017 @ 3:02pm*

Still as long as they don't use the phrase 'MONSTROUSLY carcinogenic', thunder beast should be OK.

or possibly 'release the diabetes monster'

or 'My children's teeth are MONSTROUSLY rotted due to poisonous green water candy'

[ reply to this | link to this | view in chronology ]

## Add Your Comment

Have a Techdirt Account? **Sign in now**. Want one? **Register here**

name

email

☐ Subscribe to the **Techdirt Daily** newsletter

url

subject

comment

Comment Options:

- ⦿ Use **markdown**. ◯ Use plain text.
- Remember name/email/url (set a cookie) ☐

Submit   Preview

« Pennsylvania Court Says Bloggers Protected By Journalist...   EU Plans To Weaken Encrypted Communications Despite ... »

**Tools & Services**
Twitter
Facebook
RSS
Podcast
Research & Reports

**Company**
About Us
Advertising Policies
Privacy

**Contact**
Help & Feedback
Media Kit
Sponsor/Advertise
Submit a Story

**More**
Copia Institute
Insider Shop
Support Techdirt



Brought to you by Floor64

# Monster Energy Tries To Crush Small Business Brewery In DC

**dailycaller.com**/2016/03/12/monster-energy-tries-to-crush-small-business-brewery-in-dc/

<u>Business</u>



REUTERS/Sam Mircovich

- 
- 
- 
- _____

<u>Steve Birr</u> Vice Reporter
March 12, 2016 4:47 PM ET
Energy drink company Monster Energy is suing a Washington, D.C.-based craft soda brewery over trademark infringement in a case the defendant says exposes the corporation as a bully.

Thunder Beast, a <u>root beer brewery</u> owned and operated by D.C. resident Stephen Norberg, is in a legal battle with Monster Energy over claims the craft brewery's trademark encroaches on Monster's ownership of the word "beast." Monster Energy, known for the

slogan "Unleash the Beast," alleges Norberg's brand is too similar and might confuse shoppers looking for a Monster product.

"Monster Energy Co. is notorious for harassing small businesses with aggressive legal action that is nearly impossible to fight against because it is so expensive and time consuming," Norberg told The Daily Caller News Foundation. "The actions of bullies are frequently mean and unnecessary, which is what I consider the practice of attacking significantly more small businesses than anyone else over alleged trademark infringement."

The massive energy drink company is a regular aggressor in trademark suits, going after 50 businesses in similar cases since 2012, according to Norberg's lawyer Eve Brown. A Montana-based energy drink producer even preemptively sought a declaratory judgement that their Victory Energy LLC did not infringe on Monster Energy trademarks in 2014, after receiving a cease and desist letter from Monster. Victory Energy also referred to the national company as a "trademark bully" in legal documents, reports Law 360.

Norberg's Thunder Beast brand is not even in the energy drink business. The craft soda he brews out of a small location tucked between a dry cleaner and take-out food restaurant contains no caffeine or other popular energy ingredients. Norberg, a Harvard graduate, said he simply brews homemade root beer, the product of a childhood love affair with the beverage.

Thunder Beast, which Norberg operates by brewing, filling and personally distributing bottles to area restaurants and stores, does not have the resources to defend itself from a corporate behemoth like Monster, Norberg told TheDCNF. He sees Monster's lawsuit as a stretch that attempts to link his trademark with theirs in an effort to destroy his company, as Norberg said it has done to countless others.

TheDCNF reached out to the law firm representing Monster Energy, Knobbe Martens Olson & Bear LLP, for comment, but did not receive a response at the time of publication.

"Petitioner [Monster Energy] will be damaged by continued registration of Respondent's THUNDER BEAST mark in that the THUNDER BEAST mark is confusingly similar to Petitioner's BEAST Marks," Monster Energy's filing with the U.S. Patent and Trademark Office stated. "Potential purchasers, upon seeing the distinctive formative BEAST in Respondent's THUNDER BEAST mark, are likely to mistakenly believe that such a term and the beverages offered thereunder originated with or are connected or associated with, or sponsored, licensed or approved by Petitioner [Monster Energy]."

Norberg is fighting back with a public relations push he and his lawyer hope will bring attention to Monster Energy's actions. Norberg contracted Brown, who's law firm Bricolage Law, advocates for small businesses in trademark disputes that would otherwise not be able to afford defense. Brown explains that unlike in civil court, where aggressive legal actions

can be sanctioned, no such defense exists in trademark proceedings — small businesses are often left destroyed unless they have potentially hundreds of thousands of dollars in defense funds.

"The bottom line here is that Monster Energy Company has a long history of trying to block small and resource-strapped ventures from entering the market through what I see as the wrongful use of legal proceedings," Brown told TheDCNF. "We are hoping that, by enabling more challenged ventures to fight back, the practice of 'trademark bullying' that has gone unchecked for so long will become less and less attractive to the bullies, and allow more startups and entrepreneurs to thrive."

Norberg is hopeful that he can fight the lawsuit and grow the reach of his brand. The alleged infringement on Monster's "Unleash the Beast" trademark is, in his opinion, a weak argument that will not stand the test of public scrutiny.

"Thunder Beast is a craft beverage obsession," Norberg told TheDCNF. "We enjoy creating complex and intriguing products to delight consumers who are weary of the generic offerings of huge brands that use cheap and boring ingredients. Thunder Beast is an experience, not just something to drink."

_Follow Steve on Twitter_

Content created by The Daily Caller News Foundation is available without charge to any eligible news publisher that can provide a large audience. For licensing opportunities of our original content, please contact licensing@dailycallernewsfoundation.org.

# Monster Energy: The World's Biggest Bully When It Comes to Small Businesses

**energydrinkslawsuit.com**/monster-energy-worlds-biggest-bully/

Evan Allgood

March 23, 2016



Over the past several years, the Monster Beverage Corporation (<u>formerly Hansen's Natural</u>) has grown into a juggernaut, accumulating $2.72 billion in revenue and a market cap of $27.3 billion. Unfortunately, like a lot of powerful entities, Monster is also a merciless bully— one that bankrupts and squeezes out small businesses at every turn.

<u>Fight Back</u>

Monster now faces an antitrust lawsuit in California after allegedly influencing brokers not to work with its competition. The Hip Hop Beverage Corp., which produces Pit Bull Energy drinks, says that in 2013, its "master broker" Mid Valley Products cut ties with Hip Hop under pressure from Monster.

According to Hip Hop, its sales on military bases were picking up, and Monster felt threatened. (<u>Energy drinks are extremely popular among military personnel.</u>) When Hip Hop tried to go through another broker, Reese Group, Monster allegedly leaned on them as well. Reese also terminated its contract with Hip Hop.

The suit argues, "Monster's actions with Mid Valley and Reese Group evidence a pattern of conduct intended to keep competitors out of the military resale market—by not allowing competitors access through the normal supply channels."

Sadly, <u>this type of behavior is par for the course for Monster</u>.

## World's Biggest Bully for Past Two Years

The underhanded tactics alleged by Hip Hop would not be out of character for Monster, which was America's biggest trademark bully in 2015 (according to Trademarkia) and <u>2014</u>.

In just the past few months, Monster has gone after at least a dozen small businesses over

trademark infringement. Victims include the Monster Leadership Alliance, which produces books on leadership; Ice Monster, which sells flavored ice products to restaurants and cafes; and Baker Mills, which makes Kodiak Cakes bakery and pancake mixes under the slogan "Unleash Your Inner Bear."

Over the last four years, Monster has sued at least 50 small businesses (see a full list here) —and they don't appear to be stopping anytime soon.



## Monster Sues Brewery, Aquarium Website

Earlier this month, Monster sued Thunder Beast, a Washington, D.C.-based craft soda brewery, seeking to cancel Thunder Beast's existing "Thunder Beast" trademark.

Monster claims that Thunder Beast's use of the word "beast" would confuse consumers looking for Monster, whose slogan is "Unleash the Beast." Thunder Beast is a dark, caffeine-free root beer. Its colors are black, white, and red, and its slogan is "Drink Thunder."

 

Thunder Beast owner Stephen Norberg told *The Daily Caller News Foundation*, "Monster Energy Co. is notorious for harassing small businesses with aggressive legal action that is nearly impossible to fight against because it is so expensive and time consuming."

But Norberg's representation, Bricolage Law Firm, recently beat Monster in a similar case: last month, the U.S. Trademark Trial and Appeal Board ruled that businessman Li-Wei Chih was allowed to register the brand name MonsterFishKeepers.com for use on apparel. (Monster had claimed it owned a family of trademarks using the word "Monster.")

MonsterFishKeepers.com is a tropical aquarium website.

## Thunder Beast Suit Evokes Rock Art

Thunder Beast isn't the first craft brewer Monster has tried to run out of town. In 2009, Monster sued a small Vermont beer brewer called Rock Art, sending a cease-and-desist letter demanding that they stop selling their "Vermonster" beer. The public rallied around Rock Art, and in 2009 they reached an agreement with Monster allowing them to use the name on beer but not energy drinks. (Rock Art has never produced, sold, or had any other affiliation with energy drinks.)

Rock Art owner Matt Nadeau was happy with the outcome, but also called for trademark reform. "I understand big corporations have built their businesses," he said, "but the small guy needs to be able to fight a reasonable battle."



## No Stranger to Litigation

For all its bullying of others, Monster Energy has faced several high-profile—and much more serious—lawsuits of its own, most notably stemming from the deaths of two teenagers, Anais Fournier and Alex Morris.

Fourteen-year-old Anais Fournier suffered cardiac arrest and died in 2011 after drinking two 24-ounce Monsters in a 24-hour period. Shortly thereafter, her family filed a wrongful death suit against Monster for failing to warn consumers about its drinks' potential hazards. In 2013, the family of 19-year-old Alex Morris filed a similar suit.

In May 2013, the city attorney of San Francisco, Dennis Herrera, sued Monster Energy for targeting children in its marketing, calling it "the industry's worst offender."

Hold Them Accountable

Two years later, Monster reached confidential (and likely sizable) settlements with the Morrises and with the wife of Shane Felts, a 42-year-old Kansas City man who died in 2014 after drinking a can of Monster a day for just two weeks. (The wrongful death suit filed on

behalf of Anais Fournier was scheduled to go to trial in August 2015, but there has been no word on its outcome, so this suit too has presumably ended in settlement.)

Earlier this year, Morgan & Morgan joined forces with Maryland attorney Kevin I. Goldberg, who represented the Fournier family and other energy drink victims. We have already filed 13 lawsuits against Monster, and are now investigating claims for more than 100 people who have suffered significant injuries after consuming energy drinks.

We have gone up against one of the most infamous bullies in history, Big Tobacco, winning $90 million in settlements. This makes Morgan & Morgan the perfect firm to stand up to the new bully on the block: Monster.

# Exhibit B



**THUNDER BEAST**        Home    Epic Battle    Story    Fight    Order



[OVERVIEW]    [CONTENDERS]    [TIMELINE]    [MONSTERS]

# EPIC TRADEMARK BATTLE

Thunder Beast has been locked in an absurd legal battle with the billionaire bullies of Monster Energy Co. (MEC) for over 3 years now. MEC is notorious in the trademark world for starting more trademark disputes than any other US company over the last few years. They've filed over 1,000 claims since 2010.

**"Monster Energy has truly been a monster when it comes to trademark bullying over some of the most frivolous claims imaginable" -Techdirt.com 3/30/2017**

MEC has demonstrated a repeated pattern of bullying small businesses into changing their names and giving up their brands. There are hundreds of examples. The few small businesses willing and able to hire expensive legal representation are frequently silenced because MEC tends to offer to drop the case or "settle" in exchange for a Non-Disclosure Agreement that effectively silences the victims.



But not Thunder Beast. Thunder Beast has steadfastly stood their ground refusing to yield despite the settlement offers and absurd legal shenanigans. Thunder Beast is closing in on winning 2 major victories in 2019 to set powerful precedents to stop MEC from so easily bullying small businesses.

The actual lawsuit is laughable: MEC is claiming the Thunder Beast brand is so confusingly similar to their own that customers have been buying Thunder Beast root beer willy-nilly thinking it's somehow a Monster Energy product. And not only that, but MEC is claiming that Thunder Beast is dishonest, unfair, fraudulent, malicious, and oppressive!

In response to the lawsuit, Thunder Beast immediately released new labels with the slogan, "Are you afraid of monsters, or are monsters afraid of you?"

## WHY DOES THIS EVEN MATTER?

This isn't about root beer. **This is about fighting for truth and justice. This is about inspiring others to chase their dreams, and to not be afraid of the bullies standing in the way. This is about knowing there are very real monsters in this world oppressing and hurting people, and if we do nothing to fight them, then who will?**

Since our decision to fight back, we've received messages from many other small businesses who are also being bullied by MEC including a children's book author, car part manufacturers, a softball bat company, a mobile pizza stand in the UK, a chef promoting healthy living for kids, several beverages companies, and others. And we're fighting back for all of us.

We believe true success is sticking to your principles no matter the cost, and that the only way to overcome the bullies and injustice in this world is to be willing to face them head on. Thunder Beast is risking everything in this fight. And when we win, we know we'll be helping others. We're in it for that sweet taste of justice, and because bullying is NEVER okay.

Then what? The next step is winning our lawsuit, but that's not all. Our end game is establishing legal precedents so that other victims can fight back, getting some of the laws changed to prevent trademark bullying, and to help establish a non–profit to resource and protect other small businesses. And, of course, to make the most badass root beer the world has ever seen!

## WE'RE GOING TO LEAVE THIS WORLD A LITTLE SWEETER AND A LITTLE BETTER THAN WE FOUND IT

Read MEC's **lawsuit** in its laughable entirety, as MEC desperately begs the court to make Thunder Beast stop "oppressing" them!

Read Thunder Beast's epic **counterclaim** seeking truth and justice, and holding MEC accountable for their actions.



Home            Our Epic Battle      Ingredients
Order           Fight Monsters       Wholesale
Locations       Story                Privacy Policy

**THUNDER BEAST**       Home    Epic Battle    Story    Fight    Order



**OVERVIEW**       **CONTENDERS**       **TIMELINE**       **MONSTERS**

## ARE YOU AFRAID OF MONSTERS?

Legend has it that the Thunder Beast (the American bison, which is the national mammal of the United States of America) is the *only* animal known to charge aggressively into storms. All the other animals flee from thunderstorms in fear and run in the opposite direction. Thunder Beasts are known for taking challenges head on and *never* EVER backing down.

Thunder Beasts are intrepid. They do not give up. They never surrender. They hurl themselves headlong into danger.



Common folklore says that MONSTERS are best known for hiding under beds and in closets so they can scare small defenseless children during the night. They prey on the weak. They attack the helpless. They're afraid of fair fights and prefer to operate from the shadows.

But as children grow up, they discover that monsters are not actually very scary. There is no reason to be afraid. Monsters are bullies that rely on intimidation and fear. Monsters are *only* as scary as you let them be.

If you think about it, each one of us has monsters in our lives that are bullying us and trying to keep us down. Eventually, we all have the same choice to make:

*Will we run in fear when life gets hard? Will we let bullies control our fate? Or will we stay true to ourselves, and fight the monsters in our path, and fearlessly face down every single challenge and obstacle keeping us from our dreams?!*

We hope that you will join us, and choose to live life the Thunder Beast way!

## DRINK THUNDER. FIGHT MONSTERS!

**THUNDER BEAST**       Home    Epic Battle    Story    Fight    Order



**OVERVIEW**        **CONTENDERS**        **TIMELINE**        **MONSTERS**

Many are already calling it the fight of the century! It's a showdown of epic proportions between two mythical creatures. Not only that, but it's the true story of a known fat cat corporation throwing their weight around, seeking to destroy the dream of a small business through unreasonable legal aggression.

<u>**Thunder Beast**</u> is a small craft soda company based on the dream of a man who bet his entire life savings on his love of root beer. He met his wife at a farmers market after she bought a float from him. It's run by a CEO who is also a brewer, bottler, inventor, friendly neighborhood root beer delivery guy, janitor, recipe creator, visionary, and professional root beer drinker. It's a company committed to donating 10% of their profits to charity. Thunder Beast is fighting this battle out of principle so truth can prevail, and to take a stand for the victims of bullying everywhere. Because bullying is never okay!

<u>**Monster Energy Co.**</u> is a corporation run by billionaires with an extensive record of taking aggressive legal action against small businesses. They are *the most* notorious <span style="color:red">trademark bully</span>. They devote great amounts of time and money to try to prevent anyone else from using the generic words "Beast" and "Monster" narcissistically pretending to own a monopoly on that part of the English language. *A*nd they haven't exactly received glowing reviews from some of their own female employees <span style="color:red">lately</span>.



**#ThunderFunder legal defense fund!**

**DONATE**        **SIGN UP**



$8,305                         $50,000

Contributions: 68              Total Raised: $8,305



**THUNDER BEAST**      Home      Epic Battle      Story      Fight      Order

**OVERVIEW**      **CONTENDERS**      **TIMELINE**      **MONSTERS**

# EPIC BATTLE TIMELINE

**Here's the Thunder Beast experience in all its glory with the Monster Energy Co. (MEC) trademark bullies. 2.5 years and counting, because Thunder Beast never gives up and never backs down. Bullying is *never* okay.**

## 2016

### *January*
**MEC files a petition to revoke the already approved Thunder Beast Trademark, claiming that consumers will be wildly confused and will mistakenly purchase Thunder Beast products thinking they are getting MEC products.**

### *February*
**Thunder Beast isn't scared. After discovering that most law firms offer extremely prohibitive rates for trademark defense, Thunder Beast lawyers up with <span style="color:red">Bricolage Law Firm</span>, a boutique firm with flat rates seeking to empower entrepreneurs. Thunder Beast starts crowdfunding their campaign of justice.**

### *August*
**After all their bluster, MEC admits they *finally* got around to looking at the Thunder Beast website only to discover that Thunder Beast actually just sells soda and uses a bison with non-conflicting colors (turns out, Thunder Beast products are not confusingly similar to MEC products at all). So MEC offers to "amicably resolve" the case. MEC asks Thunder Beast to grant EXTENSION #1. It seems clear that MEC aggressively bullies everyone, and then picks and chooses which fights are worth it.**

### *Late October*
**After some back-and-forth about an agreement over the use of certain words, images, and colors, MEC attorneys agree to Thunder Beast terms and ask for ANOTHER week to get final approval from MEC's CEO.**

### *Late November*
**MEC attorneys confirm they're willing to agree to terms and move forward, BUT still no word from the dilatory CEO of MEC who still needs to sign off with the final word and is apparently off galavanting who-knows-where and unable and/or unwilling to respond. MEC asks for EXTENSION #2.**

## 2017

**January**
MEC attorneys report still NO RESPONSE from MEC's CEO. Asks Thunder Beast for EXTENSION #3.

**February**
Guess what? Still no response from MEC's CEO. So Thunder Beast notifies MEC that the discovery process has started, and MEC has to start turning over hoards of documents.

**Update: Several HOURS later**
Well, well, well! MEC responds immediately with a new and slightly different settlement offer that would require Thunder Beast to agree to never use the color green again! Then MEC asks Thunder Beast for EXTENSION #4. More negotiating. MEC requires Thunder Beast to turn over discovery documents and sift through all their emails and files.

**March**
MEC sends Thunder Beast an updated settlement proposal essentially offering to drop the case and walk away if Thunder Beast will agree to never talk about it again. Thunder Best says: NO, we're going to fight this out for the little guys everywhere who are being bullied and silenced and picked on. Thunder Beast isn't afraid of Monsters. Thunder Beast fights for truth and justice!

**Later in March**
MEC attorneys complain about "deficiencies" in Thunder Beast's answer to various ridiculous discovery requests and complain that without more information, they "will have no choice but to seek relief from the Board."

**End of March**
Junior MEC attorney deposes Stephen Norberg in DC for 2 days, and gets far more than she bargained for. Armed with ample delicious and refreshing Thunder Beast beverage to drink during the onerous time-wasting proceeding, he calmly dispenses the cold hard truth and squashes any remaining hope of the superfluous argument MEC thought they had.

**June**
Thunder Beast attorney deposes MEC's CEO for a day to see how he likes it.

**September**
It becomes apparent that MEC only has a single option left! They file a motion to strike all of Thunder Beast's evidence, whining about how it's unfair and Thunder Beast shouldn't be allowed to use it. Interestingly enough, most of the evidence came from MEC's deposition of Thunder Beast, where MEC's lawyer got to ask whatever questions she wanted. Oops!

# 2018

**January**
Coming off MEC's $400 million net sales increase in 2017, the billionaire bullies continue to complain to the government that Thunder Beast's name is so unfair and damaging it *must* be forcibly revoked. This has been going on for 2 years now!

**May**
MEC hires an expert witness to visit stores attempting to show the world how unfair Thunder Beast is being by somehow exploiting MEC's marketing and sales channels. It massively backfires! Not a single store investigated was shown to carry both MEC and Thunder Beast products. *Not a single store*.

**June**
In an act of sheer desperation, MEC attempts to *block* the extremely damaging

ruling from the US Patent and Trademark Office from coming out that would protect Thunder Beast's trademark and set an important legal precedent against the bullies. MEC attempts to suspend that ruling at the last minute by filing a lawsuit in federal court against Thunder Beast claiming:

*"Defendants have irreparably injured Monster ... for which Monster has no adequate remedy ..."*

MEC begs the court to forcibly remove Thunder Beast's trademark, give Thunder Beast's money to MEC, stop Thunder Beast from selling Thunder Beast products, and literally DESTROY everything bearing the Thunder Beast name. MEC accuses Thunder Beast of "fraud, oppression, and malice" seeking "exemplary damages."

*August*
After asking for 4 extensions and drawing a simple trademark case out as long as possible spanning 2.5+ years, MEC suddenly has an extreme amount of urgency. They desperately plead for a default judgement against Thunder Beast, seeking to unfairly end the lawsuit before Thunder Beast can even respond. Obviously, this impetuous ploy fails and Thunder Beast is more than happy to have their day in court. Thunder Beast fights for truth and justice!

*August*
Thunder Beast responds by printing, "Are you afraid of Monsters, or are the Monsters afraid of you?" on all their new products, and files a counterclaim against Monster Energy. Thunder Beast will have their day in court, and some lucky jury is going to have the story of a lifetime!



#ThunderFunder legal defense fund!

**DONATE**     **SIGN UP**

$8,305                                                    $50,000

Contributions: 68                        Total Raised: $8,305



Home            Our Epic Battle        Ingredients
Order           Fight Monsters         Wholesale
Locations       Story                  Privacy Policy

© 2013 – 2018 Thunder Beast LLC   |   *AMERICA*   |   info@drinkthunderbeast.com

THUNDER BEAST

Home    Epic Battle    Story    Fight    Order

## Fight Monsters

Thunder Beast makes delicious root beer. We're not going to pretend like that's not part of this. But our real mission and true purpose is far greater than just crafting tasty drinks.



## LET'S MAKE OUR WORLD A BETTER PLACE.

We are all about chasing dreams and living passionately, but our primary objective is to take a stand against the monsters out there oppressing and destroying the good things in life.

Everyone has a monster that they must overcome. For some, it's a bully at school or work. For others, it's dealing with sexual harassment or discrimination in everyday life. And for far, far too many that monster is human trafficking.

There are more monsters and injustices in this world than we can count, but we are taking a stand. We are going to take them on, face them down, and fight it out to the end!

That's why we are committed to donating a minimum of 10% of our profits to causes that Fight Monsters, and we are always looking for new partnerships and future collaborations with large and small organizations.

---

Home
Order
Locations

Our Epic Battle
Fight Monsters
Story

Ingredients
Wholesale
Privacy Policy

© 2013 – 2018 Thunder Beast LLC   |   *AMERICA*   |   info@drinkthunderbeast.com

# Exhibit C

Page 83

1    on the top with the stars and stripes, he also did

2    that.

3        Q.  The idea for Drink Thunder, Fight

4    Monsters, that was your idea?

5        A.  Yes.

6        Q.  The iteration before this label, there was

7    no Fight Monsters, correct?

8        A.  That's correct.

9        Q.  Okay.  What did it say?

10       A.  It was just Drink Thunder.  My slogan for

11   a long time was just Drink Thunder.

12       Q.  Okay.  Then you added Fight Monsters

13   later?

14       A.  That's correct.

15       Q.  And that was after the cancellation

16   proceedings brought by Monster?

17       A.  That's correct.

18       Q.  In 2016?

19       A.  Yes.  I added it, I believe, in 2016.

20           (Exhibit 54, TB181FED, marked for

21       identification.)

22       Q.  All right.  I marked as Exhibit 54 a

Page 95

1    all three of these.  I have them for -- I recently

2    made this document and I don't recall which I've

3    shared because they're for different situations.

4    But I believe I've shared this one.

5         (Exhibit 62, TB149FED, marked for

6       identification.)

7    Q.   I've marked as Exhibit 62 a document with

8    production number TB149FED.

9         Do you recognize this document?

10   A.   Yes, I do.

11   Q.   What is this?

12   A.   This is a Fight Monsters banner that I

13   created myself; and I don't recall how I used it,

14   but probably either on social media or my website

15   at one time, or possibly both.

16   Q.   When did you create this?

17   A.   It would have been 2016 or later.

18   Q.   And what do you mean by "Monsters"?

19   A.   To me the term "Fight Monsters" is a

20   deliberate choice of words.  I did it for two

21   reasons:  One is I wanted to be clear that I don't

22   agree with Monster Energy's allegations that

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 96

1   Thunder Beast is confusingly similar to their

2   brand, and by putting Fight Monsters on my

3   products, I thought it was effective in making that

4   clear that I am as distinguished as possible --

5   those two brands are as different as possible.

6          And I have taken up the use of the word

7   "monster" or "monsters" specifically to call out

8   injustices I see in the world that are based in

9   bullying.

10          And so monsters are different for

11   different people, but I believe that everyone has a

12   monster in their life, and that it is something

13   that is very challenging or hard, so it could be

14   cancer or an illness for one person.  It could be

15   bullying at school for a child.  It could be

16   assault or abuse or human trafficking for somebody.

17   It really depends on the person, but it is whatever

18   people are afraid of.

19      Q.  So what's shown in Exhibit 62, you don't

20   know if you've used this anywhere?

21      A.  I'm pretty sure I have.  I don't recall

22   the specific use of it or where.  I remember making

Page 173

1          A.   Two people had made videos just about my

2      hand-bottling process and I had copies of those, so

3      I sent them in case he wanted to know more about

4      them.

5          Q.   Any other videos other than just

6      hand-bottling process?

7          A.   No.

8          Q.   No.

9               So what did you tell him in terms of why

10     you put Fight Monsters on the website?

11          A.   I don't remember my exact words, but I've

12     been very consistent and open with sharing that the

13     reason why I put Fight Monsters on my logo, on my

14     bottles is because I believe that everyone has a

15     monster in their life that they have to stand up

16     to.

17              And my hope is that by me personally and

18     my company being egregiously bullied by Monster

19     Energy through this trademark proceeding, that I am

20     a victim of bullying, and so I'm trying to spin it

21     in a positive way to give hope and inspiration to

22     people who are facing really hard challenges, and

Page 174

1   so the theme is that everybody has a monster in

2   their life, something unfair or hard or oppressive,

3   and I want my message to get to them and say, stand

4   up to the bullies, stand for what you believe,

5   charge into the storms of life and don't back down.

6          Q.   So that's what you told him or are you

7   just kind of --

8          A.   Something along those lines.

9          Q.   Something along those lines.

10         A.   It's not word for word, but that's the

11  message I've been consistent in trying to repeat.

12         Q.   So what was the conclusion of your meeting

13  with Nathan?

14         A.   He said he would be in touch if, you know,

15  he wanted more information.

16         Q.   So was he planning to make a film about

17  Thunder Beast?

18         A.   I think so, but he didn't -- I didn't sign

19  anything, we didn't have any, you know, definitive

20  details of what was happening.  I'm not sure if

21  I'll ever see anything from that.  He didn't offer

22  to give me any footage or payment or give me

Page 175

1    anything out of it.

2         Q.  Did he -- is there some agreement to touch

3    base at a certain point in time?

4         A.  No.  I assumed that we would be in touch,

5    but I've not been in touch with him since then.

6              MR. ZORETIC:  So you say that you did

7    produce the e-mails?

8              MS. BROWN:  I believe we did.  But if you

9    don't have them, let me know and we can find them.

10             MR. ZORETIC:  Okay.  I'll check.

11        Q.  Okay.  So back to Exhibit 68, you have a

12   line under Sales Tax that says "Donations."

13             Do you see that?

14        A.  Yes.

15        Q.  And what is that?

16        A.  Those are donations I made in the Thunder

17   Beast name to organizations that I believe fight

18   monsters and I did it to support them.

19        Q.  Okay.  So I don't see a donations line in

20   your 2017 P&L.

21             Am I right?

22        A.  That's right.  I didn't keep track of it

Page 197

1    effectively encapsulates a shared experience that

2    most people have of facing something that is evil

3    and it is big and scary and hard and is primarily

4    based in fear.

5         It really resonates with me that many

6    children grow up in America hearing stories about

7    how there are monsters under the bed and there are

8    monsters hiding in the closet, and those kids

9    eventually grow up and realize that it was nothing

10   more than fear that they were afraid of.

11        And I believe that fear is one of the most

12   evil things in this world that is able to really

13   hold us back and keep us from achieving our dreams.

14   And if people can realize that they don't have to

15   be afraid anymore of the monsters and that they can

16   claim their stories boldly and in truth, then I

17   don't think that they will be held back anymore.

18       Q.   Why did you put Fight Monsters on the

19   product itself?

20       A.   I thought that was the most effective way

21   to get my message out, if it was front and center

22   to my labels, then when consumers saw it and they

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 198

1    heard about my story, and they read that Thunder

2    Beast is getting bullied by this huge company, and

3    their response is to make it not about them, but to

4    make it about all the other people who are

5    struggling, I thought that would be the most

6    inspirational message that I could have.

7         Q.   So did you intend consumers to think of

8    Monster Energy when they saw Fight Monsters on the

9    label?

10        A.   No.   I did not want people to think about

11   Monster Energy directly, which is why I didn't say

12   Monster Energy or something more similar.   I

13   assumed that people would read my story and they

14   would hear about my bullying and think it's unfair,

15   but I would be happy if no one ever thinks of

16   Monster Energy ever again in connection with me,

17   and I would much rather them just see the monster

18   in whatever connotation that word has in their mind

19   from their life and their past experience, which I

20   think is just this kind of generic really evil

21   scary being, that that is what would inspire them.

22        Q.   But aren't you in fact trying to take

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 199

1  advantage of the lawsuit for marketing purposes?

2      A.  I'm not trying to take advantage of it.

3  I'm trying to survive, and in my survival of

4  raising the tens of thousands of dollars that I've

5  so far had to pay for my legal expenses that I

6  would like to recoup and eventually be able to turn

7  a profit again, like I used to turn before Monster

8  Energy came after me, I think that would be great.

9          But more than anything, I want to help

10  other people and I want to make the world a little

11  bit better.

12      Q.  Well, before Monster initiated its

13  cancellation proceedings, did you want to help

14  other people or did you care about other people?

15      A.  I did.  I think as a -- as a vision of

16  Thunder Beast, I would say I started it primarily

17  as a passion for craft soda, and secondarily,

18  because I think it's really cool when people chase

19  their dreams and make things that they're

20  passionate about.

21          But after a couple of years -- you know, I

22  met my wife at a farmers' market, she bought a root

Page 200

1    beer float from me, and I really do feel like I

2    achieved my initial primary dream of creating a

3    product that was delicious and it was really good

4    and I'm proud of the products I made.

5            And so there came a point where I wanted

6    to be much more than that.  And so to loop back to

7    your original question, I have always taken it very

8    seriously personally to try to make the world a

9    better place and help people, which is why when I

10   graduated from Harvard, I interned with a number of

11   different campus ministries, I started my own

12   church.

13           I worked in some areas where I really

14   didn't make very much money, when many of my

15   classmates made a lot of money.  I mean, Mark

16   Zuckerberg was a classmate of mine and obviously I

17   didn't expect to be like that.  But we were the

18   same year at Harvard and I knew a lot of people

19   that made a lot of money.

20           And I made a promise to myself when I

21   graduated that it was more important to me to stay

22   true to myself and make the world a better place

Page 201

1    than just to capitalize on whatever abilities and

2    skills that I had.

3            And when I get to the end of my life and I

4    look back, I want to be proud of that choice and

5    I'm not going to have any regrets and I feel good

6    about that.

7       Q.   So instead of the term "monsters" did you

8    consider any other terms to use?

9       A.   I did.   I've thought about using "bullies"

10   because I think bullies also encapsulates some of

11   the things that I want to do, but ultimately, I

12   thought that "monsters" had a better -- better ring

13   to it, thinking especially about how kids grow up

14   hearing about monsters under their bed, I thought

15   that really resonated with me, with everyone who

16   had had that experience.

17           And also the way that Hollywood has made a

18   whole bunch of monster movies and it's kind of a

19   known genre and it's a creature that has a

20   legendary being, a creature that's existed for

21   probably since the beginning of time, and so I

22   think that resonates with people even more than

Page 202

1    bullies.

2         Q.  Did you consider any other terms other

3    than "bullies"?

4         A.  No, I don't think so.

5         Q.  How much time did you spend thinking about

6    other terms other than "monster" and "bullies"?

7         A.  Not a lot.  It was pretty immediate.

8         Q.  Do you believe that adding Fight Monsters

9    to the label was a poke in the face to Monster

10   Energy?

11        A.  I saw it not as a poke in the face to

12   Monster Energy.  I saw it as a kind of a signal to

13   other people who were being bullied by Monster

14   Energy.

15            I know there have been over a thousand

16   lawsuits filed against many small businesses or

17   other companies by Monster Energy, and I think that

18   number is really high and really unfair.

19            And so I thought with all these other

20   victims out there, if I can put a message on my

21   bottle saying, look, you're not alone, you can

22   stand up to bullies, you don't have to be afraid, I

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 203

1    felt like that was really powerful.

2         Q.   So you are intending for it to refer to

3    Monster Energy then?

4         A.   I think it -- I think that Monster Energy

5    falls under the category of monsters I want to

6    fight against, but ultimately, I don't expect that

7    to always be the case.

8              And it's up to Monster Energy to choose

9    whether or not they want to behave like a monster

10   by my definition, and it certainly would not apply

11   to them if they were to make a few adjustments and

12   stop being so egregious in their aggressive

13   unreasonable legal pursuit of destroying people's

14   lives.

15        Q.   But you did intend for people to recognize

16   when they saw Fight Monsters on your bottle that

17   some of them would think of Monster Energy, and you

18   intended that, right?

19        A.   I expected that some people would read the

20   story about me and that they would see that there's

21   a connection.  I intentionally chose the word

22   "Fight Monsters" rather than "monsters" or

5/23/2019          Monster Energy Company v. Thunder Beast, LLC   Stephen Norberg 30(b)(6)

Page 204

1    something that was positive monsters because I

2    wanted my label to show that I was in no way

3    affiliated with Monster Energy.

4         If their claim was that I was confusingly

5    similar, I thought putting Fight Monsters would be

6    the way to be the maximum amount of not confusing.

7    Q.  Did you ask any attorneys whether it would

8    be appropriate for you to put Fight Monsters on

9    your label?

10    A.  Before I put it on my label, I talked to

11    my attorney about it.

12    Q.  Which attorney did you talk to?

13    A.  Eve Brown.

14    Q.  And did she give you an opinion?

15    A.  She did, yes.

16    Q.  And what was her opinion?

17    A.  I don't recall the specifics of the

18    conversation, but I remember feeling like it was

19    something that I wanted to do and was a good

20    choice.

21    Q.  Did she provide you a written opinion as

22    to whether it would be appropriate or not, legally?

Page 211

1    and somebody by the name of Nick Desper; is that

2    right?

3        A.  Yes.

4        Q.  Do you know Nick?

5        A.  No.

6        Q.  Is this the only communications you've had

7    with him?

8        A.  I believe so.

9        Q.  Okay.  So he wrote to you on April 30th,

10   2018, correct?

11       A.  Yes.

12       Q.  Okay.  And you responded to his e-mail on

13   May 1st, 2018; is that right?

14       A.  Yes.

15       Q.  So in the second paragraph, you say,

16   "We're getting ready to launch our new Fight

17   Monsters campaign, obviously inspired by the case

18   and start donating ten percent of our profits to

19   organizations that fight the monsters of society,

20   specifically donating to anti-bullying groups for

21   children and organizations fighting human

22   trafficking."

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 212

1          Do you see that?

2      A.  Yes.

3      Q.  And what did you mean by "obviously

4  inspired by the case"?

5      A.  The case has really inspired me to do some

6  soul searching and think about what I'm doing, why

7  I'm doing and my response to the hard things I've

8  faced.

9          And in concluding that what I am facing is

10  very unfair, it inspired me to take action to help

11  other people and make my injustice about something

12  much bigger than myself.

13      Q.  But why do you say "obviously inspired by

14  the case," why do you mean what by that?

15      A.  I think anyone who reads my story will see

16  a one-man company standing up to a $35 billion

17  company and say that's really inspiring.

18      Q.  So you don't think "obviously inspired by

19  the case," you're actually referring to Fight

20  Monsters campaign, the name?

21      A.  I think that people would hear that and

22  say, oh, yeah, Monster Energy is being a complete

Page 213

1  monster in this case and that I think the meaning

2  would be Monster Energy is being really obnoxious

3  and egregious and awful and would be strong enough

4  to inspire this consumer of Monster Energy products

5  to stop drinking it, I think that's pretty

6  powerful.

7      Q.  But isn't it true that when you say

8  "obviously inspired by the case," you're saying

9  it's obvious because you have the word "monster" in

10  Fight Monsters, correct?

11       MS. BROWN:  I object to how leading your

12  question is.  Can you rephrase?

13       MR. ZORETIC:  I'm allowed to ask leading

14  questions.  Please.

15      Q.  Go ahead.  You can answer.

16      A.  I did not name Fight Monsters after

17  Monster Energy, trying to get people to think about

18  Monster Energy.  I took my situation of being

19  bullied and what I felt was harassment against me

20  and I turned it into a campaign to inspire other

21  people to help them.

22          And I'm not the one who chose to name

Page 215

1    monster, but if they stop -- stop doing what

2    they're doing, I would no longer consider them a

3    monster as is the label on my case -- on my

4    bottles.

5        Q.  Is it your -- sorry.

6            Is it your testimony that you're not

7    referring to Monster Energy when you say "Fight

8    Monsters"; that's your testimony?

9        A.  Monster Energy is a subset of the monsters

10   that I'm referring to, but it is completely

11   dependent on the actions of Monster Energy as to

12   whether or not they would fall under that category.

13       Q.  But you've put them under that category,

14   right?

15       A.  They've put themselves under that

16   category.  There's a website talking about the

17   worst trademark bullies, and I reference this on my

18   website, and they call Monster Energy a complete

19   monster for how they have been bullies.

20           I think many people would recognize that

21   Monster Energy is living up to their name in this

22   case of being something that is a force of bullying

Page 216

1    and maybe even evil or malice and going a little

2    above and beyond what's necessary to aggressively

3    try to stop people and even maybe ruined their

4    lives or livelihood.

5          I think they're being monstrous in this

6    case and that the word is a great choice of words.

7    Q.  Was it necessary for you to put Fight

8    Monsters on your labels?

9    A.  It wasn't necessary to do it.  It wasn't

10   necessary to choose the word "Thunder Beast" as my

11   brand, but I think Thunder Beast is an awesome

12   brand and I chose it of all the other options as my

13   favorite and best, and that's the same reason I put

14   Fight Monsters on my labels is I thought that was

15   the best slogan to add to my bottles.

16   Q.  You like monsters -- the word "monsters"

17   being on your bottle, it helps your brand?

18   A.  I like the symbolism of standing up to

19   something that's evil and wrong.  And to me the

20   word "monsters" encapsulates that.

21         I do not want to be seen as a monster or

22   compared to a monster or for anyone to ever think

Page 218

1    specifically monetarily, I have donated to a

2    number of organizations over the course of my life

3    and donated a lot of my own time.

4        Q.  So isn't it true that you're using Monster

5    Energy and its lawsuit to build your brand?

6        A.  I'm using the lawsuit to try to survive

7    and recoup the legal fees.  I think a lot of people

8    have been very sympathetic to me about my story and

9    when they hear about what I've faced, I've raised

10   almost $10,000 of my legal fees from people who

11   just think it's unfair and they want to support it.

12       And the reason why I started donating

13   money is I wanted it to be clear that I'm not

14   trying to benefit or profit off of this as much as

15   I'm trying to help other people make this about

16   something bigger than myself.

17       Q.  Could you make it about something bigger

18   than yourself without using the word "monster"?

19       A.  I think I could, but I don't think it

20   would be as effective.  I think the word "monster"

21   really is -- if you look at all the other possible

22   words, I don't think there would be a better one.

Page 220

1      Q.  So before you met your wife, did you ever

2   look at another girl?

3      A.  Yeah, for sure.

4      Q.  Okay.  But you don't want to look at other

5   words besides "monsters"?

6      A.  I think this is a great analogy.  In the

7   same way that I had been on some dates and I had

8   looked at other women, when I met my wife, I knew

9   that she was a keeper and she was really great.

10      I have encountered a number of words in my

11   life as an educated human being and when I found

12   one that fit what I wanted, I just knew it was a

13   good one.

14      And I'm serious, if I find a word or

15   slogan that I think better furthers my mission, I

16   will change it.

17      Q.  And you said trying to survive and recoup

18   legal fees.  What do you mean by that?

19      A.  I think Monster Energy's primary tactic is

20   to try to exhaust and destroy small businesses by

21   dragging cases on as long as possible, sometimes

22   unfairly, maybe even unethically, and I think that

5/23/2019          Monster Energy Company v. Thunder Beast, LLC    Stephen Norberg 30(b)(6)

Page 221

1    for me to just be able to stay in business and keep

2    fighting is a huge sign of success and something

3    I'm really proud of because I think probably anyone

4    else in my position would have given up long ago

5    and I'm proud of the fact that I've been able to

6    make it so far with so few resources and it's

7    because a lot of people believe in me and are

8    willing to give me money to support me.

9        Q.  So this is part of your brand; is that

10   what you're saying?

11       A.  Yeah, a part of my brand is that I'm not

12   afraid to stand up to the billionaires who are

13   bullies and who are doing wrong and I think a lot

14   of people will appreciate that.

15       Q.  Uh-huh.  So the lawsuit is like help

16   building your brand; is that what you're saying?

17       A.  I believe that the lawsuit is a very good

18   test to my character, and if I can come out on the

19   other side victorious, then it will be a true David

20   and Goliath story, and I think that will a really

21   great thing.

22       Q.  But to date, are you saying that the

Page 221

1    for me to just be able to stay in business and keep

2    fighting is a huge sign of success and something

3    I'm really proud of because I think probably anyone

4    else in my position would have given up long ago

5    and I'm proud of the fact that I've been able to

6    make it so far with so few resources and it's

7    because a lot of people believe in me and are

8    willing to give me money to support me.

9        Q.  So this is part of your brand; is that

10    what you're saying?

11        A.  Yeah, a part of my brand is that I'm not

12    afraid to stand up to the billionaires who are

13    bullies and who are doing wrong and I think a lot

14    of people will appreciate that.

15        Q.  Uh-huh.  So the lawsuit is like help

16    building your brand; is that what you're saying?

17        A.  I believe that the lawsuit is a very good

18    test to my character, and if I can come out on the

19    other side victorious, then it will be a true David

20    and Goliath story, and I think that will a really

21    great thing.

22        Q.  But to date, are you saying that the

Page 224

1    created something very distinct and different.  And

2    it was personally insulting to me when Monster

3    Energy came after me and said that I created a

4    brand that was confusingly similar to their own

5    because if I really were to be compared to Monster

6    Energy and their values and their products, while

7    they may be a successful company by some metrics,

8    by my metrics, they're a failure and they're not

9    something I would want to be associated with.

10        Q.  Do you think the lawsuit with Monster

11   Energy is an excellent and positive thing?

12        A.  In my darker times, it is soul crushing

13   and it is full of hopelessness and despair.  And in

14   my brighter moments, it is one of the things I

15   think I'll be most proud of in my life, of standing

16   up out of faith and principle more than anything

17   else to take what is unjust and hard for me and to

18   turn it into something so much bigger than me that

19   it can inspire and help other people.

20        Q.  You mentioned a thousand lawsuits brought

21   by Monster Energy.

22        A.  Yeah.

Page 248

1    and that's kind of the timeline, and I'm hopeful to

2    be able to win the trial and prove that I am not

3    guilty and I am in the right and I'm justified in

4    what I've done.

5       Q.  So going back to the product labels, does

6    the use of Fight Monsters on your product label

7    serve to identify the Monster Energy Company?

8       A.  I think, as I said before, that the word

9    "monsters" is a very descriptive word that includes

10   a whole bunch of different things and that Monster

11   Energy, based on their actions, falls under that

12   purview.

13          If Monster Energy were to change their

14   actions and not be so aggressive and be what I

15   consider to be unfair and take part in bullying

16   action, then they would no longer qualify under

17   that definition.

18      Q.  So then you're saying it does serve to

19   identify Monster Energy Company?

20      A.  I'm saying that Monster Energy, based on

21   their actions, would definitely be defined as the

22   kind of monster that my term on the label is

Page 249

1   talking about.

2           But it's purely based on their actions and

3   if they stop being bullies and stop the things I

4   think that are wrong, then they would no longer be

5   classified by that word.

6      Q.   Are you trying to explicitly identify

7   Monster Energy on your labels by the use of Fight

8   Monsters?

9      A.   I'm trying to identify a broader class of

10  things that I think are wrong.  I really am

11  trying -- I'm trying hard to call out the injustice

12  and the bullies and the things that I think are

13  wrong.

14          And my sights are set on far bigger things

15  than a company in California that is just bullying

16  people and doing unfair things.  I really want to

17  take on bigger injustices and bigger problems with

18  my labels and my cause.

19     Q.   So when you say "a broader class," within

20  that broader class that you're defining, you're

21  trying to identify Monster Energy Company?

22          A.   I am trying to identify the character and

Page 250

1    values that it seems like Monster Energy espouses

2    through the bullying that they are doing.  To me,

3    the word "monsters" is really all about what the

4    concept of a monster conjures up, as something that

5    is really big and kind of evil and dark and mean,

6    and I think that Monster Energy has a choice of

7    whether or not they want to fall under that

8    category or not, and it's really up to them.

9           And I don't think people would read Fight

10   Monsters and think of Monster Energy normally, but

11   in this case, if Monster Energy is being a bully

12   and hurting people, then people might see that, oh,

13   that could be one of the monsters that falls under

14   that category.

15       Q.  But what's your intent?  Is your intent

16   to -- to serve -- is your intent that Fight

17   Monsters on your products, is it to serve to

18   identify Monster Energy Company, is that your

19   intent?

20       A.  It's not specifically for Monster Energy.

21   I remember having conversations with my wife and

22   other people about this, and when I first found out

Page 251

1   about the lawsuit, I was angry and I had a lot of

2   strong emotions and I had to process those things

3   to figure out if I wanted to just become a bitter,

4   vengeful person, or if I wanted to make this about

5   something bigger than me.

6         And I decided that I didn't want to let

7   something unfair that happened to me turn me into

8   someone I did not want to become.  And one of the

9   hardest things that I've done is my wife and I have

10  specifically tried to be true to our faith as

11  Christians, which says you should bless those who

12  hurt you and pray for your enemies, and we've spent

13  time together praying and blessing on Monster

14  Energy and asking that good things would happen

15  intentionally so I don't become bitter or angry or

16  upset.

17        And I really don't want to damage or

18  injure Monster Energy through anything that I do.

19  I simply want Monster Energy to recognize that what

20  they're doing is wrong and I want them to change

21  their ways and stop doing what they're doing, that

22  I consider to be bullying and wrong.

Page 252

1          And if Monster Energy stops bullying and

2     oppressing small businesses, then I really do wish

3     them the best and hope that they're successful and

4     do all the things that they want.

5          But if they continue to hurt and oppress

6     people, I have a problem with that and that's why

7     I'm standing up in this lawsuit and I'm not backing

8     down.

9      Q.   And that's why you put Fight Monsters on

10    your product label?

11      A.   The reason I put Fight Monsters on my

12    product label was to take a stand against the

13    greater injustices.

14      Q.   Which you include Monster Energy in?

15      A.   I would consider Monster Energy a -- one

16    of the smaller minor monsters in the world of

17    injustices, and I want to go after the big monsters

18    in this world, the really evil things.

19          And to me, it's just kind of a -- it's the

20    start of this, you know, vision and goal for

21    Thunder Beast is me winning this lawsuit.  But

22    ultimately, I don't really want to ever have

Page 253

1   anything to do with Monster Energy.  And I want to

2   take on things that I specifically say on the back

3   of my label, which are bullying and human

4   trafficking; I want to take on monsters like that

5   and I want to fight those monsters and inspire

6   people to fight those monsters.

7        Q.  Does the use of Fight Monsters on the

8   product label serve to compare Thunder Beast

9   products with any of Monster Energy's products?

10       A.  No, I don't want to compare my products

11  with Monster Energy.  I want to be as separate and

12  different from Monster Energy as possible.

13       MR. ZORETIC:  Okay.  We've been going for

14  a while.  Let's take a break.

15       THE VIDEOGRAPHER:  Time is 3:04.  Off the

16  record.

17       (Proceedings interrupted at 3:04 p.m. and

18       reconvened at 3:21 p.m.)

19       THE VIDEOGRAPHER:  Time is 3:21.  We're

20  back on the record.

21       (Exhibit 77, TB001FED- 015FED, marked for

22       identification.)

Page 253

1   anything to do with Monster Energy.  And I want to

2   take on things that I specifically say on the back

3   of my label, which are bullying and human

4   trafficking; I want to take on monsters like that

5   and I want to fight those monsters and inspire

6   people to fight those monsters.

7        Q.  Does the use of Fight Monsters on the

8   product label serve to compare Thunder Beast

9   products with any of Monster Energy's products?

10        A.  No, I don't want to compare my products

11   with Monster Energy.  I want to be as separate and

12   different from Monster Energy as possible.

13        MR. ZORETIC:  Okay.  We've been going for

14   a while.  Let's take a break.

15        THE VIDEOGRAPHER:  Time is 3:04.  Off the

16   record.

17        (Proceedings interrupted at 3:04 p.m. and

18      reconvened at 3:21 p.m.)

19        THE VIDEOGRAPHER:  Time is 3:21.  We're

20   back on the record.

21        (Exhibit 77, TB001FED- 015FED, marked for

22      identification.)

Page 287

1    other events with it in the past year.

2         I think there was a little event at a

3    barbecue place in Austin, Texas that I may have had

4    this and sold product, but I think that's the only

5    place.

6         Q.  Okay.  In the bottom you have, "We are

7    always looking for new partnerships and future

8    collaborations."

9         Do you see that?

10        A.  Yes.

11        Q.  What are you referring to there?

12        A.  One of the things I really enjoy doing is

13   partnering with other people or organizations to

14   further the mission of Fight Monsters, which is

15   taking on social injustice and encouraging people

16   to stand up against bullies and things that are

17   wrong.

18        And I am really hopeful that through my

19   stand, that I will just get more and more

20   individuals and organizations to network with me

21   who have a similar vision so we can work together

22   and collaborate together.

Page 325

1    We're off the record.

2            (Proceedings interrupted at 4:50 p.m. and

3    reconvened at 4:58 p.m.)

4            THE VIDEOGRAPHER:   Time is 4:58.   We're

5    back on the record.

6    BY MR. ZORETIC:

7        Q.   Do you have any intention of removing

8    Fight Monsters from your products?

9        A.   That depends largely on what Monster

10   Energy does and how I feel about other issues.

11       Q.   So what do you mean by that, on what

12   Monster Energy does and how you feel about other

13   issues?

14       A.   So if I come up with a better term that I

15   like better and the case is no longer going on --

16   actually, that's not true.   I think that I will

17   continue using Fight Monsters for the foreseeable

18   future.

19       Q.   Have you considered removing the Fight

20   Monsters mark from your products?

21       A.   Recently in thinking about the lawsuit and

22   what concessions I would make to settle, like

Page 326

1    through mediation and other settlement offers, I

2    was thinking about whether or not I would do it and

3    I have decided that I don't think I want to.

4         I think that the word is too powerful and

5    the message is too powerful and that I'll -- for

6    the foreseeable future I'll continue with Fight

7    Monsters.

8    Q.  Do you agree that you're using Fight

9    Monsters as a mark to identify the -- to identify

10   your product?

11        MS. BROWN:  Objection to the extent you're

12   asking for a legal definition of mark.

13   A.  Could you rephrase -- or re-ask the

14   question?

15   Q.  Sure.

16        Are you using Fight Monsters on your

17   product as a trademark to help identify your

18   products?

19   A.  No.  I don't know that I would ever want

20   the trademark Fight Monsters as part of Thunder

21   Beast.  I suppose I might.  But I don't have plans

22   to trademark Fight Monsters.

Page  327

1          I see it less of something that is

2    definitively tied to my brand and more of a call to

3    action that I -- a message I want to get out and

4    call to action for people to take up.

5       Q.  So using -- are you using Fight Monsters

6    to help people associate with your brand?

7       A.  I really don't see it that way.  I see the

8    Fight Monsters as something that is a call to

9    action and an act of inspiration that I want to get

10   people to take up and claim for themselves.

11          And I want them to take that phrase and

12   apply it to whatever it means for them.

13      Q.  Has anyone communicated to you about

14   whether there was any relation or affiliation

15   between Thunder Beast and Monster?

16      A.  I have never had someone come up to me and

17   say that there was any -- that they thought there

18   was an affiliation or a connection.  I've never had

19   someone confuse my products with the Monster Energy

20   product.

21          And I've never had someone come up and ask

22   me if the Fight Monsters was because I was somehow

Page 327

1        I see it less of something that is

2    definitively tied to my brand and more of a call to

3    action that I -- a message I want to get out and

4    call to action for people to take up.

5        Q.  So using -- are you using Fight Monsters

6    to help people associate with your brand?

7        A.  I really don't see it that way.  I see the

8    Fight Monsters as something that is a call to

9    action and an act of inspiration that I want to get

10   people to take up and claim for themselves.

11           And I want them to take that phrase and

12   apply it to whatever it means for them.

13       Q.  Has anyone communicated to you about

14   whether there was any relation or affiliation

15   between Thunder Beast and Monster?

16       A.  I have never had someone come up to me and

17   say that there was any -- that they thought there

18   was an affiliation or a connection.  I've never had

19   someone confuse my products with the Monster Energy

20   product.

21           And I've never had someone come up and ask

22   me if the Fight Monsters was because I was somehow