1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3       HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   MONSTER ENERGY COMPANY, A        )
    DELAWARE CORPORATION,            )
6                                    )
                       PLAINTIFF,    )
7                                    )
              vs.                    ) No. CV 18-1367-AB-AS
8                                    )
    THUNDER BEAST LLC, A DISTRICT    )
9   OF COLUMBIA LIMITED LIABILITY    )
    COMPANY AND STEPHEN NORBERG,     )
10  AN INDIVIDUAL,                   )
                                     )
11                     DEFENDANTS.   )
    _____)

12

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              FRIDAY, AUGUST 30, 2019

17                    9:08 A.M.

18              LOS ANGELES, CALIFORNIA

19

20

21

22  _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA 90012
25               cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3           KNOBBE, MARTENS, OLSON & BEAR, LLP
             BY:  MATTHEW S. BELLINGER, ATTORNEY AT LAW
 4           2040 MAIN STREET, 14TH FLOOR
             IRVINE, CALIFORNIA 92614
 5           (949) 760-0404

 6
     FOR THE DEFENDANTS:
 7
             BURKHALTER KESSLER CLEMENT & GEORGE LLP
 8           BY:  AMANDA V. DWIGHT, ATTORNEY AT LAW
             2020 MAIN STREET, SUITE 600
 9           IRVINE, CALIFORNIA 92614
             (949) 975-7500
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              LOS ANGELES, CALIFORNIA; FRIDAY, AUGUST 30, 2019

 2                          9:08 A.M.

 3                            - - -

 4         THE CLERK:  Calling Civil Case 18-1367, Monster

 5  Energy Company versus Thunder Beast LLC, et al.

 6         Counsel, please step forward and state your

 7  appearances.

 8         MS. DWIGHT:  Good morning, Your Honor.

 9         Amanda Dwight on behalf of defendant.

10         THE COURT:  All right.  Good morning.

11         MR. BELLINGER:  Good morning, Your Honor.

12         Matt Bellinger with Knobbe Martens on behalf of

13  plaintiff, Monster Energy.

14         THE COURT:  Good morning to you as well.

15         I did issue -- I'm sorry, let me just pull up my

16  file here.

17         I did issue a tentative in this case.  Have the

18  parties had a chance to review the tentative?

19         We'll start with Mr. Bellinger.

20         MR. BELLINGER:  Yes, Your Honor.

21         THE COURT:  All right.

22         And Miss Dwight?

23         MS. DWIGHT:  Yes, Your Honor.

24         THE COURT:  So I've got a couple questions, and

25  then I just would like to -- to the extent we have -- sort
```

```
 1   of, have a -- what we used to call in my old days as a
 2   criminal defense lawyer sort of a "come to Jesus"
 3   conversation with respect to this case.
 4            So, Mr. Bellinger, why don't you step to the
 5   lectern, and we'll start with you.
 6            So I guess I'll just be direct.  What's really
 7   going on in this trial?  And, specifically, I have real
 8   concerns, to be honest, of whether or not should the Court
 9   contemplate sua sponte granting a motion for summary
10   judgment on behalf of the defendant because I'm not
11   convinced there is a likelihood of confusion and, at least,
12   based on what I have seen, there may be a legitimate fair
13   use defense.
14            And I am just trying to understand what's really
15   going on with this case.  And maybe you are not in a
16   position to tell me at this time, but we're getting close to
17   trial.  We have a trial date in January of next year.
18            You have done your discovery, and I am just
19   trying -- as I look at the photographs are we really
20   supposed to believe that people are confused by this
21   Thunder Beast root beer, thinking that it might be one of
22   the Monster brands and this notion that "Fight Monster"
23   somehow is a spin-off, if you will, of the Monster -- I just
24   have a hard time, you know -- when I am looking at this, I
25   am like what is this really about?
```

```
 1              MR. BELLINGER:  Yes, Your Honor.

 2              So in 2002, over a decade before defendant

 3   existed, Monster launched its Monster line of energy drinks

 4   and since that time has continuously used the

 5   "Monster Energy" mark, as well as a family of "Monster"

 6   marks, in connection with its beverage products.

 7              At the time Monster launched its original Monster

 8   energy drink in 2002, it also used "Unleash the Beast" on

 9   the container of that drink and since that time has also

10   expanded to adopt a family of "Beast" marks.

11              THE COURT:  Right.  No.  I get all that.  I have

12   read the papers.  I mean, I got young kids.  I know what

13   Monster is about.

14              But, I mean, when I look at the papers and just

15   looking at the two drinks here, is there really a likelihood

16   of confusion here?

17              MR. BELLINGER:  We believe there is, Your Honor.

18              And it started off with defendant only using

19   "Thunder Beast" on the label.  There was an issue in the

20   Trademark Office, the cancellation proceeding that Monster

21   initiated to cancel that -- that registration.

22              THE COURT:  But you guys then filed this suit

23   here.  You never got a ruling in those proceedings.

24   Correct?

25              MR. BELLINGER:  That is correct.
```

```
 1              During the course of those proceedings, defendants
 2    decided to add "Fight Monsters" to the label of their
 3    beverages.  And Monster is the only company that owns a
 4    "Monster"-inclusive trademark registration in the U.S. for
 5    soda.
 6              So at that point, when the defendant started using
 7    those two terms together, which is something that Monster
 8    had been doing for well over a decade, selling --
 9              THE COURT:  Let me stop you.
10              You said when Thunder Beast started using
11    "Fight" -- those two terms together.  What are the two terms
12    that you are saying that Monster had been using since 2002?
13              MR. BELLINGER:  Yes, Your Honor, a
14    "Beast"-inclusive mark and a "Monster"-inclusive mark
15    together.
16              THE COURT:  So you are telling me that -- they
17    didn't put them together.  I mean, it's "Thunder Beast," and
18    then they have the, hashtag, "Fight Monsters."  You are
19    saying that having those in the same vicinity somehow
20    creates a likelihood of confusion?
21              MR. BELLINGER:  Yes.  The defendants put the
22    "Drink Thunder, Fight Monster" mark on their label next to
23    their "Thunder Beast" mark.  So they are using a
24    "Monster"-inclusive mark and a "Beast"-inclusive mark on
25    their label, and they are using them in proximity to each
```

```
1   other.
2           THE COURT:  Well, is it really in proximity?  I am
3   just trying to pull up the motion here.  Hold on.
4           I mean, you've got this "Thunder Beast," and what
5   I -- I mean, no disrespect intended -- I look at this
6   "Thunder Beast" in sort of an old Atari-ish type of font,
7   and then beneath it, "Drink Thunder, Fight Monsters."
8           Are you saying that they're that closely
9   juxtaposed that someone might say, "Oh, this is the Monster
10  energy drink"?
11          MR. BELLINGER:  Yes.  We think that people viewing
12  this would think that at least there is an association or
13  affiliation or that Monster has somehow sponsored or
14  endorsed the drink because it has a "Monster"-inclusive mark
15  on it.
16          And in addition --
17          THE COURT:  So should all these Halloween
18  manufacturers next month start to be scared about using the
19  term "Monster"?
20          I mean, it just strikes me that Monster is taking
21  this very aggressive approach of, if you even breathe the
22  word or think about using the word "Monster," we're going to
23  come after you.
24          I mean, again, I just don't see it.  There is no
25  clause.  There is no "unleash" anything.  There is no -- at
```

 1    least just from the naked eye, I don't see any similarity.

 2              And I guess related to that, what's the evidence

 3    that there is some likelihood of confusion?

 4              MR. BELLINGER:  So the -- well, I guess with

 5    respect to the Halloween question, here the issue is they've

 6    put it on a beverage, a nonalcoholic beverage that is a

 7    beverage similar to what Monster is selling.

 8              With respect to evidence of confusion, Monster has

 9    developed strong rights in a family of "Monster" marks and

10    in a family of "Beast" marks, not just "Unleash the Beast,"

11    but Monster has -- since launching the original Monster

12    energy drink in 2002, has used other "Beast" marks such as

13    "Rehab the Beast" --

14              THE COURT:  "Unleash the Nitro Beast," "Pump the

15    Beast," I get that.

16              MR. BELLINGER:  Yes, Your Honor.

17              So there is a family of marks that Monster is

18    going to be able to establish that it has used extensively

19    on beverages and that it has frequently used those "Beast"

20    marks together with a "Monster" mark on those beverages, and

21    defendant is doing the same thing and put "Fight Monsters"

22    on their label with full knowledge of Monster's trademark

23    rights.

24              THE COURT:  And how -- walk me through what

25    evidence do you have of confusion.

```
 1            MR. BELLINGER:  I think the evidence of confusion

 2   is the strength of the "Monster" marks that Monster has

 3   built up and then the fact that the defendant is using these

 4   two marks, which are similar in appearance.

 5            In terms of actual confusion in the marketplace,

 6   not much of this product has been sold.  So there really

 7   hasn't been a meaningful opportunity to go out and find

 8   consumers have been confused.

 9            THE COURT:  I guess that's my point.

10            I mean -- and I guess it relates to -- and look.

11   I am going to acknowledge up front I am jumping around just

12   because -- I am just looking at this case.  We've all got

13   busy lives.  We all have clients to represent.  I get that.

14            But, really, you are going to go to trial on this

15   case with a company that some solo guy who is making root

16   beer and Monster is so concerned that somehow he is going to

17   get into the market share and confuse millions of people to

18   buy this drink?

19            I mean, you are even acknowledging -- I mean,

20   there is no -- well, let me ask you.  Let me ask the

21   question.

22            Is there any concrete evidence of confusion as it

23   relates to "Thunder Beast" and your client's drinks?

24            MR. BELLINGER:  If by "concrete" you mean like an

25   actual consumer that says, "I've been confused"?
```

```
 1              THE COURT:  Right.

 2              MR. BELLINGER:  We haven't found that evidence.

 3    That evidence is usually hard to find and particularly with

 4    inexpensive products like this.  Someone who might be

 5    confused is unlikely to take the time to write a letter or

 6    call the company and make that report.

 7              THE COURT:  Have you made any efforts toward -- I

 8    am just curious -- doing a consumer survey in that regard to

 9    see if anyone is thinking, "Oh, I bought this root beer and

10    I thought it was Monster, and I come home, and when I look

11    closely, I realize it's just some guy -- you know, some solo

12    guy who just likes root beer"?

13              MR. BELLINGER:  We did not submit a likelihood of

14    confusion expert report in this case.

15              We did submit a report regarding secondary meaning

16    of Monster's mark, you know, what level of purchasers

17    associate the term "Monster" with its beverages but not a

18    comparison of the two brands.

19              THE COURT:  And if this case goes to trial, don't

20    you have to prove the likelihood of confusion?

21              MR. BELLINGER:  Yes.  That is the underlying basis

22    for the infringement claim/unfair competition claim.

23              THE COURT:  And so what's the evidence?  I mean,

24    again, I am just trying to figure out -- I mean, we are

25    going to go to trial in January.
```

```
 1              What's the evidence of likelihood of confusion

 2    here?

 3              MR. BELLINGER:  So the evidence, going through

 4    some of the relevant Sleekcraft factors, would be that

 5    Monster has --

 6         (Reporter clarification.)

 7              MR. BELLINGER:  I'm sorry.

 8              The evidence of confusion going through some of

 9    the pertinent Sleekcraft factors in the case would be the

10    strength of Monster's marks, its "Monster" family of marks

11    and "Beast" family of marks; the fact that the parties are

12    using the marks on closely related, if not identical, goods,

13    namely, beverages.

14              THE COURT:  So just beverages.  I mean, it's not

15    even an energy drink.  It's root beer in a -- what appears

16    to be a glass container and your drinks that I think, by and

17    large -- I may be wrong on this -- are usually in aluminum

18    cans.  Right?

19              MR. BELLINGER:  Usually in cans, although Monster

20    has sold some bottles.

21              THE COURT:  Some bottles.

22              MR. BELLINGER:  But predominantly cans.

23              THE COURT:  Okay.  Go ahead.  Just walk me through

24    this.  I am just trying to understand.

25              MR. BELLINGER:  Sure.
```

  1          We believe the marks are similar.  The

  2    "Thunder Beast" mark could be -- is likely to be confused

  3    with Monster's "Beast" marks, for example, you know,

  4    "Unleash the Beast," "Pump up the Beast," "Rehab the

  5    Beast" --

  6          THE COURT:  You think that that's going to get

  7    confused with this Thunder Beast American Root Beer?

  8          MR. BELLINGER:  We do, and particularly because

  9    they're using both the "Thunder Beast" mark and they've

 10    added a "Monster" mark on the label.

 11          And Monster uses a variety of "Monster" marks

 12    beyond Monster Energy.  For example, it uses "Monster

 13    Assault" or "Punch Monster."

 14          THE COURT:  Okay.

 15          MR. BELLINGER:  Consumers would be likely to think

 16    that "Fight Monsters" on a beverage is a variant of

 17    Monster's marks.

 18          THE COURT:  Okay.  And so continue.

 19          The next element is evidence -- isn't the next

 20    element evidence of actual confusion?

 21          MR. BELLINGER:  That is one of the elements, and

 22    that can be accorded bearing weight depending on the

 23    circumstances.

 24          Here, the defendant really, as I mentioned before,

 25    has not sold much by way of product.  So there hasn't really

1    been a meaningful opportunity for actual confusion to occur

2    in the marketplace.

3              And the goods, as I mentioned, are also relatively

4    inexpensive, you know, less than a few dollars for a bottle.

5    So someone -- even if they were confused, probably not worth

6    their time and effort to report that.

7              THE COURT:  Okay.  Please continue.

8              We're talking about marketing channels used.

9    That's next.

10             MR. BELLINGER:  Yes.

11             So the products are sold through similar marketing

12   channels, the limited sales that there have been.  They've

13   been sold in at least one of the same stores.

14             THE COURT:  I have got to tell you.  I mean, when

15   I am looking at these Sleekcraft factors, it just seems like

16   you don't have a lot.  Again, maybe I am missing something.

17   That's why I wanted to have you here.  I'm like, "What am I

18   missing here?"

19             I get it.  You know, look.  I worked at a firm

20   that represented Mattel, and I get the whole importance of

21   protecting your mark, but against this Thunder Beast?

22             I mean, I don't think they look similar.  It's a

23   company that you have -- at least as you are standing here,

24   I don't know what evidence you are going to have of any

25   likelihood of confusion.

```
 1            You really want to put eight in the box and try to
 2   convince them that this Thunder Beast -- I forget the
 3   gentleman's name, this guy from Harvard -- is out there
 4   trying to take the market share?
 5            I mean, it is -- I mean, look.  I get what the
 6   defendant is doing here.  There is a play on words, and
 7   there is this David and Goliath sort of aspect to it.  But I
 8   genuinely think that there are some real issues in the
 9   plaintiff's case and, as evidenced by the tentative, there
10   may be a fair use defense here.
11            And so I guess I am saying all this to say -- I
12   mean, I guess I will get to the punch line.  Have you all
13   sat in the room and tried to resolve this in any way, shape,
14   or form?
15            MR. BELLINGER:  We have, Your Honor.  So we had a
16   mediation in May with JAMS that was a full-day session,
17   which ended up not being successful.
18            There was a subsequent exchange of settlement
19   proposals after that that the defendant was not agreeable
20   to.  So there have been settlement talks.
21            THE COURT:  And I am just curious.  What are you
22   looking for?  Do you basically want them to shut down?  Is
23   that it or --
24            MR. BELLINGER:  No.  We're not asking them to shut
25   down or put them out of business.  But we do want some
```

1    assurances going forward that the marks are not going to be

2    used in a way that would be even more likely to cause

3    confusion.

4         And there is a real issue with, you know,

5    particularly the term "Monsters" on a beverage, which is

6    something, at least in the -- this nonalcoholic space, that

7    Monster has very strong rights in.

8         THE COURT:  And so your view is -- or the client's

9    view is that anyone who creates any kind of beverage, if

10   they even think about using the word "Monster" in a

11   beverage, that's a problem for you.  That's infringement,

12   from your perspective.

13        MR. BELLINGER:  I mean, I can't answer that in the

14   abstract because confusion -- at least in terms of a

15   District Court case is determined as how the marks are

16   typically used in the marketplace.  So I think you would

17   have to look at the product, how it's marketed, how it's

18   positioned.

19        But I think that in general would be a concern in

20   this -- or at least this type of beverage.

21        THE COURT:  Okay.  All right.

22        Any other points you wish to raise with respect to

23   the tentative?

24        MR. BELLINGER:  So with respect to the tentative,

25   Your Honor, I would focus on page 3, the discussion of the

1    threshold element.

2          And so here, we think the undisputed testimony is

3    that defendants are claiming to use the "Fight Monsters"

4    mark or slogan, as I think they have sometimes called it, as

5    part of a general call to arms in terms of their -- you

6    know, to support their anti-bullying marketing campaign.

7          And the undisputed evidence is defendants contend

8    that "Fight Monsters" refers to any sort of Monster in

9    society.  Some of their marketing materials give examples of

10   human trafficking, discrimination, sexual harassment.

11         Mr. Norberg, in the declaration submitted in

12   support of the defendants' opposition, in paragraph 14

13   testified, "And I chose the word 'Monsters' as the plural

14   form of the now Monster because this world is filled with a

15   vast array of monsters that come in many different shapes

16   and sizes."

17         THE COURT:  Yeah, but he also indicates that he

18   was referring to your client, didn't he?

19         MR. BELLINGER:  He, at the start, said

20   Monster Energy may be a type of monster, but defendants have

21   not contended and do not contend that "Fight Monsters" is

22   intended to be a specific sole reference to Monster Energy

23   Company.  That's their view of the world.

24         And in all of the fair use cases cited by the

25   parties in which fair use has been found -- for example, the

 1  Cairns vs. Franklin Mint case involving Princess Diana --
 2  fair use was found, but the use by the Franklin Mint of
 3  Princess Diana's name and likeness was a specific reference
 4  to her.  It wasn't a more blanket umbrella reference on what
 5  she fit under.
 6          In the New Kids on the Block case in which fair
 7  use was found, a newspaper was running a telephone poll
 8  asking people what they thought about the band, and that was
 9  found to be fair use.
10          But the use by the newspaper of New Kids on the
11  Block was a specific reference to New Kids on the Block. It
12  was not a more general term.
13          In the Toyota vs. Tabari case, in which there were
14  some questions of fair use and the scope of an injunction
15  against a -- auto broker who was using the Lexus name, the
16  Court there found that the auto broker, when they said
17  "Lexus," they were referring to Lexus, they weren't
18  referring to, you know, an umbrella type of cars.
19          THE COURT:  But the fact that in this case there
20  seems to be at least some debate as to whether it's dual use
21  or single use, doesn't that just in and of itself create a
22  triable issue?
23          MR. BELLINGER:  No, it doesn't.  Because for
24  nominative fair use, the defendant has to be using the
25  plaintiff's mark to describe the plaintiff's product.  And

1    in all cases --

2              THE COURT:  And only the plaintiff's product?

3              MR. BELLINGER:  Only the plaintiff's product.  In

4    all of these cases that have found fair use, it has been an

5    exclusive reference.

6              I think probably the closest case to our fact

7    situation is the Warner Bros. case that we cited in our

8    brief in which the plaintiff was Warner Bros. Studio, the

9    owner of "The Hobbit" film.

10             The defendant in that case was about to put out a

11   mockumentary film called "Age of Hobbits," and the defendant

12   in that case claimed that "Hobbits" was intended to refer to

13   the mythical species of creatures in general.

14             And the Court found that was not nominative fair

15   use because it was not -- the defendant admitted it was not

16   intended to be a specific reference to the plaintiff's

17   Hobbit books or films, it was a more general reference to a

18   species of creatures.

19             And that's the position defendants essentially are

20   taking in this case.  Under their view of the world,

21   "Fight Monsters" is a general reference to any sort of

22   monster in society.  Defendants are not claiming it is a

23   specific reference to Monster Energy Company, and that is

24   not nominative fair use.

25             THE COURT:  But isn't there a slight difference,

1    though, in this case?  Because like the other cases you

2    refer to are Princess Diana and New Kids on the Block.

3         There is only one thing that they could be

4    referring to -- Princess Diana.  There is no -- I guess

5    there could be another Princess Diana.  New Kids on the

6    Block, I mean, there is only one use.

7         You have got this term, "Monster," that -- I don't

8    know how else to say other than there is a dual use or could

9    be multiple uses for it.

10        I guess I come back to the question of does the

11   case law suggest that it has to be exclusive to one use, or

12   do we have a unique scenario here where the term "Monster"

13   has multiple meanings?

14        MR. BELLINGER:  I think the case law, the three

15   cases I went through finding fair use, in all those cases it

16   was specific.

17        "The Hobbit" case is a good example of broader use

18   of a term "Hobbits" that was intended to refer, by the

19   defendants' own admission, to a class of creature rather

20   than the plaintiff.

21        I mean, here, Mr. Norberg said that he chose

22   "Monster," didn't specifically say "Monster Energy" because

23   he wanted to refer to a broader class of people.

24        And I think defendants -- I mean, I don't want to

25   state their case, necessarily -- it seems like they're using

```
 1   this more to say there is no likelihood of confusion because
 2   of the manner in which the mark is being used by them.
 3         But that doesn't put it in the nominative fair use
 4   box.  This is a narrow defense in which you have to be using
 5   the plaintiff's mark to describe plaintiff's product.  And
 6   it's intended to allow for things like comparative
 7   advertising and things like that, recognizing that sometimes
 8   the only way to refer to plaintiff for comparative purposes
 9   is to use their name.
10         But that's not what they're trying to do here.
11   They're trying to use it as a part of a broad call to arms,
12   as part of a larger mission of -- you know, purported
13   mission of social justice, by their own admission.  It's not
14   intended to be a specific description of Monster Energy.
15         THE COURT:  And I guess to that point, does it
16   have to relate or does it have to describe your client's
17   product?  Or can it be a reference to your client in
18   general?
19         MR. BELLINGER:  It has to be describing the client
20   or the product, I mean, basically identifying the plaintiff.
21   And here that's not what the sole purpose is.  And they have
22   cited no authority for finding fair use in a case like this.
23   And, in fact, the cases that they cite, such as New Kids on
24   the Block, it's very different facts.
25         THE COURT:  All right.  Well, thank you,
```

```
 1   Mr. Bellinger.

 2              Anything else you wanted to address with respect

 3   to the tentative?

 4              MR. BELLINGER:  No, Your Honor.

 5              THE COURT:  All right.

 6              Miss Dwight, what's your response to plaintiff's

 7   arguments, and, obviously, anything that you wish to address

 8   relative to the tentative?

 9              MS. DWIGHT:  Thank you, Your Honor.

10              To address the nominative fair use defense, we are

11   in agreement with the Court that that was not the sole

12   purpose.  There was a lot of purpose to the use of that

13   phrase.

14              And the purpose of a nominative fair use defense

15   is to protect use of a mark in criticism.  That's exactly

16   what our client has done, especially on his Website, "Drink

17   Thunder, Fight Monsters."

18              "Monsters," as he testified in his deposition, as

19   well as in his declaration in support of the opposition,

20   started out as referring to plaintiff.  It then became a

21   bigger mission as a result of that litigation.

22              And if you look at the Website, which is Exhibit B

23   of Mr. Norberg's declaration, right below the phrase "Drink

24   Thunder, Fight Monsters," is the whole story of this epic

25   battle.
```

```
 1              So we would disagree that -- you know, I think

 2   it's a very narrow interpretation of how we're using our

 3   mark.

 4              And also I would ask the Court to review

 5   plaintiff's own pleading.  Paragraph 41 of their Complaint

 6   identifies uses by us of their marks on their Website,

 7   media, accounts, point-of-sale manuals.  So there is a

 8   reference directly to Monster, the plaintiff.

 9              Other than that, Your Honor -- and I am going to

10   apologize that this was not raised in the opposition

11   papers -- but we do intend to assert a classic fair use

12   defense.

13              THE COURT:  You do?

14              MS. DWIGHT:  Yes.

15              THE COURT:  Okay.  Now, I think that is news to a

16   lot of people in this courtroom.  I mean, because I thought

17   in your papers you indicated otherwise.

18              MS. DWIGHT:  Yes.  The opposition papers did not

19   address the classic fair use defense.

20              THE COURT:  Okay.  And so dare I ask why the

21   change in position?  And what is the Court to do now that

22   you have just dropped this, quote/unquote, bombshell?

23              MS. DWIGHT:  Well, I would ask the Court to

24   indulge our argument as to why we think it's still a valid

25   defense.
```

```
 1              THE COURT:  Well, before we get to that, why
 2    should the Court even entertain the argument at this stage?
 3    We're now at -- the briefings have been filed.  I thought
 4    the papers were -- I am trying to look at the papers now.  I
 5    thought --
 6              MS. DWIGHT:  The Court is correct.  It does not
 7    address the --
 8              THE COURT:  Okay.  So why -- what's the rationale
 9    as to why it wasn't raised, and what authority do I have to
10    entertain that at this time?
11              MS. DWIGHT:  Well, the hearing, I guess, is an
12    opportunity for us to raise issues that we believe are
13    relevant to support our position that there is a valid claim
14    of descriptive fair use.
15              All the evidence shows that it -- at least as far
16    as the use on the bottles themselves, the reference to
17    "Monster" is in the descriptive sense.  It is describing bad
18    actors, not in reference to -- specifically there, on the
19    bottle, to plaintiff.
20              And, again, I apologize.  I honestly don't know
21    why it wasn't raised in the opposition papers.
22              THE COURT:  Okay.  Now I am going to ask a
23    question that maybe I will regret asking.
24              What do you mean you don't understand why?  Were
25    you not responsible for --
```

```
 1              MS. DWIGHT:  We were -- yeah, we only associated
 2    in two weeks ago.  It was after the opposition papers were
 3    filed.
 4              THE COURT:  Oh, wait.  I'm sorry.  Aren't you with
 5    Burkhalter Kessler?
 6              MS. DWIGHT:  Correct, Your Honor.
 7              THE COURT:  So at least Burkhalter Kessler was on
 8    the papers in August 23rd; correct?
 9              MS. DWIGHT:  Right.  We filed the amended -- the
10    corrected opposition to include a table of contents and
11    table of authorities, but that was the extent of our
12    involvement as far as the opposition papers.  The original
13    opposition papers were filed by co-counsel.
14              THE COURT:  And is co-counsel not on the case
15    anymore?
16              MS. DWIGHT:  No, she's still on the case,
17    Your Honor.
18              THE COURT:  Okay.  All right.  It must be Friday.
19    Okay.
20              MS. DWIGHT:  Again, I apologize.
21              And I guess if we -- the argument we would make in
22    support of our defense of classic fair use is that
23    plaintiff's interpretation of the law with respect to fair
24    use we think is too narrow.
25              And we would respectfully ask the Court to take a
```

1    look at the Ninth Circuit case, Fortune Dynamic versus

2    Victoria's Secret, 618 F.3d 1025, which came out a year

3    after Cairns vs. Franklin Mint, which was cited by

4    plaintiff.

5         But in the Fortune Dynamic case, the Ninth Circuit

6    said, quote, "Fair use may include use of a term or phrase

7    in its descriptive sense which, in some instances, will

8    describe more than just a characteristic of defendants'

9    goods."

10        This broader application of the descriptive use

11   was reiterated in 2017 in the Ninth Circuit case Market

12   Quest vs. BIC.  So our argument is that it doesn't need to

13   describe -- specifically describe our product.  It does.  I

14   think it does, because when you use "Drink Thunder,

15   Fight Monsters," clearly you are referring to our product.

16        But it also describes an action that our client

17   hopes consumers will take, which is fill yourself with our

18   product, Fight Monsters.

19        THE COURT:  But can you have classic use -- can

20   you have fair use and nominative fair use?  I thought it was

21   one or the other.

22        MS. DWIGHT:  No, Your Honor.  It depends on the

23   use.  It depends on how it's being used, and it also is --

24   this is the problem with having a term that's descriptive

25   because sometimes it can be referring to the plain meaning

```
 1    of the term, and sometimes it's referring to the trademark
 2    only.
 3              THE COURT:  Okay.  What else?
 4              MS. DWIGHT:  That is -- that's it, Your Honor.
 5    Thank you.
 6              THE COURT:  All right.
 7              So, Mr. Bellinger, what's your response to this
 8    surprise argument, besides the obvious I shouldn't consider
 9    it?
10              MR. BELLINGER:  Well, you guessed my first
11    argument.  It shouldn't be considered.  It's a new argument.
12              Ms. Dwight pointed out the defendants -- her firm
13    filed a replacement brief in response to the Court's order
14    to file a brief with a table of contents and authorities.
15              In that brief, defendants actually changed the
16    brief.  They eliminated the introduction.  They added new
17    cases.  They actually made substantive changes to the brief
18    that I was surprised about.
19              But they didn't put anything about classic fair
20    use.  So this is the first time I am hearing they are now
21    trying to resurrect that defense.  But --
22              THE COURT:  Do you agree with her assertion,
23    Ms. Dwight's assertion, that it could be both?  Can you
24    pick -- can you do a fair use or nominative fair use or --
25              MR. BELLINGER:  No.  I think it's one bucket or
```

1  the other.

2         And I note in defending the -- what this new

3  classic fair use argument, if I heard correctly, counsel

4  said that on the bottles, "Fight Monsters" is describing bad

5  actors and it's not a reference to Monster Energy Company,

6  which I think tanks their nominative fair use defense, which

7  is the only defense that I think is properly before the

8  Court.

9         So I think that view is just further evidence of

10 why use of "Fight Monsters," under defendants' view, is not

11 nominative fair use because it's just a further admission

12 that defendants are not intending it to be a reference to

13 Monster Energy Company but rather a reference to bad actors

14 in general.

15        And if the Court were to entertain this classic

16 fair use defense, that defense applies when a party is using

17 a mark to describe the characteristics of their product.

18 But here, there is no evidence that "Fight Monsters"

19 describes how their product tastes or any characters or --

20 qualities or characteristics.

21        The undisputed evidence is it's being used as part

22 of a call to arms in connection with defendants'

23 anti-bullying campaign, and that use on a beverage label is

24 just simply not classic fair use.

25        THE COURT:  I am going to jump back to an earlier

1    point.

2              There -- isn't there some irony, though, in this

3    discussion?  Because one might argue that these multiple

4    meanings goes to the earlier point that's not necessarily

5    the subject of this motion but the issue of likelihood of

6    confusion because it has multiple meanings.

7              I mean, how -- I guess I am really struggling with

8    how you intend to move forward with this case.  I don't see

9    how you are going to have any evidence to show likelihood of

10   confusion in this case.

11             Again, walk me through it.  I am newer on the

12   bench.  So I may be completely missing something here, but I

13   look at this and I think how is this going to play out to a

14   jury?  And I just don't see how you are going to demonstrate

15   in any way, shape, or form other than to say -- and perhaps

16   this is your point -- Monster is important to us.  It's a

17   strong term.  So, therefore, there is the likelihood that

18   someone will be confused by it.

19             MR. BELLINGER:  Yeah.  So, again, I guess I would

20   come back to, in support of the infringement case, applying

21   the Sleekcraft factors.

22             You know, we'll be able to present extensive

23   evidence of the strength of Monster's family of "Monster"

24   marks and "Beast"-inclusive marks in connection with

25   beverages, including the types of beverages at issue here --

```
 1    nonalcoholic carbonated beverages and the fact that
 2    defendants are, you know -- made the intentional decision to
 3    use a "Beast"-inclusive and "Monster"-inclusive mark on
 4    their labels, including putting them in proximity with
 5    knowledge of Monster's trademark rights.  I mean, we think
 6    the marks are -- Monster has strong marks.  The marks are
 7    similar.  The goods are --
 8              THE COURT:  Again, walk me through why are the
 9    marks similar?  What's similar about the two marks?
10              MR. BELLINGER:  Sure.
11              Well, I mean, "Fight Monsters" is similar to
12    Monster's family of "Monster" marks.  They just basically
13    put an "S" on the end of "Monster."
14              We cited, for example --
15              THE COURT:  Go ahead.
16              MR. BELLINGER:  -- a case in the -- this is a
17    different issue because we're going back to the fair use
18    land, but we cited a case in our brief regarding
19    Virginia Tech, who owns the mark "Hokie" or "Hokies," and
20    there is a real estate firm who -- I'm sorry.  "Hokie" for
21    Virginia Tech and a real estate firm opened up in town that
22    was like "Hokies Real Estate" and were trying to make a big
23    deal of the fact that --
24              THE COURT:  But isn't that different than
25    "Monster" and "Fight Monsters"?
```

```
1              MR. BELLINGER:  Monster often uses its "Monster"
2    mark with other terms, such as --
3              THE COURT:  But I guess that's my point.
4              Is the mark "Monster" or is the mark "Monster" --
5    fill in the blanks however the client wants to -- whatever
6    the client wants to put in?
7              MR. BELLINGER:  So -- I'm sorry.
8              THE COURT:  Go ahead.
9              MR. BELLINGER:  So Monster claims at least common
10   law rights in the term "Monster" by itself and is often
11   referred to as "Monster."  Consumers might refer to the
12   product as "I am going to buy a Monster."  We have a U.S.
13   trademark registration for that.
14             But they do have registrations for marks like
15   "Monster Energy" --
16             THE COURT:  "Unleash the Beast" --
17             MR. BELLINGER:  -- "Punch Monster," "Monster
18   Assault."  So the fact that defendants have taken the word
19   "Monster" and just appended another word to it --
20             THE COURT:  But do you have a registration for
21   "Fight Monsters"?
22             MR. BELLINGER:  No, we don't have a registration
23   for "Fight Monsters."
24             THE COURT:  And isn't that significant, I mean?
25   Because -- look.  The defendant has taken the term and made
```

1  it plural and added another term to it.  To me, that has

2  multiple meanings.  It's either, as I think you propose,

3  "Fight Monsters" as one term or separated out, fight

4  multiple monsters.

5       I just have trouble understanding how your client

6  believes it has a lockdown, if you will, on anything and

7  everything related to "Monster."

8       MR. BELLINGER:  Well, consumers with respect to

9  beverages like this one -- you can go into a grocery store,

10  a convenience store, look in the case, and there is a whole

11  line of different types of Monster energy drinks that may be

12  called different things.  One may be "Monster Energy."

13  Monster has a line "Monster Rehab," "Monster Ultra."

14       So consumers are used to seeing, associated with

15  Monster Energy, the word "Monster," you know, that includes

16  another word appended to it.

17       And so simply because defendants have chosen

18  "Fight Monsters," people are not going to think, "Oh, well,

19  that has the word 'Fight' before 'Monster' so that must not

20  be a Monster Energy product."  No.  They're used to the fact

21  that Monster has come out with a line of drinks that have

22  multiple variations of its "Monster" marks.  And --

23       THE COURT:  And you really believe that someone is

24  going to see these two drinks, grab this Thunder Beast, and

25  think, "Oh, I have just purchased a new Monster drink"?

```
 1          MR. BELLINGER:  I think, yeah, and particularly
 2   because they're coupling it with this, you know, "Beast"
 3   mark on the label, "Thunder Beast."
 4          THE COURT:  Despite the fact that the packaging is
 5   completely different.  I mean, there is not even a
 6   correlation.  Like I said, I am familiar enough, I think,
 7   with the Monster drinks, your client's drinks.
 8          This root beer bottle looks nothing like it.
 9   There is no claw.  There is no neon.  There is --
10   Thunder Beast has a buffalo on it.  Again, I just -- I just
11   keep coming back don't -- I mean, a consumer is going to
12   look and know that these two things are different, aren't
13   they?
14          MR. BELLINGER:  We disagree.
15          We think that Monster has very strong rights in
16   both of these families of marks, and the fact that this
17   defendant has purposefully chose to put them together on a
18   beverage container is likely to cause confusion.
19          THE COURT:  Okay.  All right.  Yeah, I have strong
20   feelings about this.  I really do.  I just -- I don't know
21   why we are here, to be honest with you, I mean, and -- other
22   than you are just trying to crush this root beer company out
23   of business.
24          Because -- I mean, what do you want?  Do you want
25   them to take away the phrase "Fight Monsters" so they just
```

1  have "Thunder Beast, "Drink Thunder," and then you would be

2  fine with it?

3          MR. BELLINGER:  That might be okay.

4          THE COURT:  Okay.  Is there -- and I am curious.

5  I mean, if we go to trial, you are going to be seeking some

6  sort of damages?

7          MR. BELLINGER:  There is a damages claim in the

8  case, but we haven't made final decisions as to what, if

9  any, those would be.

10         I agree.  This is not really about the damages --

11  monetary damages at the end of the day.  It's really

12  about -- we're protecting the brand as a mark owner.

13         I mean, once one person starts coming in with

14  "Monster" on a label for a beverage, then, as you mentioned

15  before, brand owners have a right and obligation to protect

16  the brand or they risk losing it or diminishing it.

17         THE COURT:  All right.

18         Let me ask Ms. Dwight -- I'm sorry.

19         Do you have anything else, Mr. Bellinger?

20         MR. BELLINGER:  No, Your Honor.

21         THE COURT:  Okay.

22         Ms. Dwight, I am just curious.

23         I mean, from your perspective, has there been any

24  real -- is there any way of resolving the case?  It just

25  seems to me the only people that are going to make money out

```
 1   of this are the attorneys sitting in front of me.  I mean,

 2   I'm just being honest.  This just seems like an incredible

 3   exercise of resources.

 4         I am trying to be respectful of both sides.  I get

 5   that Monster feels that it's got to protect its brand.  It's

 6   just hard, when you see these photographs, to really think

 7   that someone is going to think, "Oh, Monster has come out

 8   with root beer now and they've detoured into having

 9   buffaloes on their brand."  I mean, it's hard for me to

10   comprehend that.

11         But having said all that, from your perspective,

12   is there any meaningful possibility of resolving the case,

13   or is this just two folks that just feel strongly about

14   their opinions and they need eight folks to make the

15   decision?

16         MS. DWIGHT:  I think there was an opportunity in

17   the beginning.  As Your Honor knows, this started back in

18   2016, maybe 2017, several years ago, under the TTAB.  And

19   then just as TTAB was about to issue their ruling, we got

20   the lawsuit.

21         I was not involved in any of the mediation or any

22   informal discussion.  My understanding is that -- I think

23   there was a point where the client -- our client could have

24   sat down and reasonably come to some sort of resolution, but

25   my sense is that it's past that point.  He has spent the
```

```
 1   last several years of his life fighting this.  He's one guy
 2   who owns the company.
 3          The other issue is that he obtained his
 4   registration.  They moved to cancel it.  They didn't oppose
 5   it when it went up for registration.  So he's fighting to
 6   protect that, and I think he's, again, being bullied, to be
 7   honest.
 8          THE COURT:  Okay.  All right.  Well, just be ready
 9   to try the case in January.  I mean, we're -- I am going to
10   do my best not to move the date.  This case has been going
11   on far too long.
12          If you all want to spend your -- the clients want
13   to spend their money that way, then I am here all day.  So
14   we'll try the case.
15          So Mr. Bellinger.
16          MR. BELLINGER:  If I may just add one more thing
17   on the settlement.
18          So we did have a mediation in May, and I thought
19   we had made good progress at the mediation.  But,
20   essentially, at the end of the day, it looked like the
21   defendant just wasn't amenable to reaching agreement.
22          Following that, we had to file a mediation
23   statement with the Court, which we did.  At that point,
24   there was some further dialogue, and we received some
25   comments from defense counsel of things that their client
```

```
 1   was looking for.

 2            So we sent a revised settlement agreement to them

 3   at the end of June and said, "Happy to talk," essentially,

 4   and then got a comment back in July that just basically

 5   said, "Not good enough," with no specific counter-proposal.

 6            So I just want to make clear that we're happy to

 7   continue discussions.  We never closed the door on those

 8   discussions.  We tried to keep discussions continuing

 9   following the mediation.

10            THE COURT:  Right.  The frustration is that,

11   again, I don't know what you want, ultimately.

12            I mean, if you are telling them to shut down, I

13   guess that's a nonstarter.  If you're saying you want the

14   words "Fight Monsters" removed or -- I will pose this to

15   you:  If "Fight Monsters" was in a different part of the

16   label, would that appease the client?

17            MR. BELLINGER:  I think -- I just don't have a

18   client rep here.  I think if they removed -- just agree to

19   remove "Fight Monsters," that would be a big step forward to

20   reaching an agreement, and I am sure we could then reach an

21   agreement of ways they could continue to use their

22   "Thunder Beast" brand on these products.

23            But it's really -- you know, this lawsuit didn't

24   start until they put "Fight Monsters" on the bottle.  That's

25   when the suit got filed.
```

```
 1              THE COURT:  Well, right.  But let's be clear.
 2  It's not like you got a halo over your head, like, "Oh, we
 3  just weren't" -- there was a protracted battle going on.
 4              And look.  Wrong or right.  The defendant said,
 5  "Okay, if you want to play this way, I am going to use a pun
 6  on words and ratchet it up a little bit."  So it's not --
 7              Well, let me just -- Miss Dwight, if your client
 8  takes "Fight Monsters" off the label, is that a nonstarter?
 9              MS. DWIGHT:  I honestly don't know, Your Honor.  I
10  am happy to relay that to --
11              THE COURT:  And I guess related to all this, does
12  it make sense for you all to sit in a room with a magistrate
13  judge?
14              Again, I am here all day.  I love trying cases.
15  So I am happy to do it.
16              But it's like -- I am looking at this and I'm
17  thinking -- okay.  You got this guy in Boston.  He's solo --
18  I want to call him solo practitioner but a solo businessman
19  who's got this root beer that I'm not even sure how much he
20  makes a year off this thing, and you've got this massive
21  company that's like, "Okay, we don't want anyone using the
22  word 'Monster,'" and it just seems to me there has got to be
23  a way to resolve this so that he can keep making his soda
24  and you don't have to worry about, I guess, some root beer
25  company taking over the market share of energy drinks.
```

1        But if I'm off base, we'll just keep the trial

2    date of January 28th set.  But it seems to me that cooler

3    minds should be able to prevail and say, "Okay.  What can we

4    do to sort of make everyone happy so we can all move on with

5    our respective lives?"

6        So a long-winded way of saying does it make

7    sense -- and, again, if you are not interested in it, I'm

8    not going to take offense to it.  I don't want to waste any

9    more of anyone's time.

10        Does it make sense to refer it out to the

11    magistrate who is assigned to this case or another one of

12    the magistrate judges in this Court to have you talk and see

13    if you can settle the case?

14        MR. BELLINGER:  From plaintiff's perspective, as I

15    mentioned before, we're certainly open to further settlement

16    discussions, and we attempted to have further discussions

17    after the mediation.

18        THE COURT:  Ms. Dwight?

19        MS. DWIGHT:  Yeah, I mean, I think it's always

20    opportune to try to resolve it without trial.

21        THE COURT:  All right.  Well, what I am going to

22    do is I am going to talk to some of my colleagues and see if

23    there -- I am going to try to identify a magistrate judge.

24        I will issue a minute order in the next week or so

25    saying -- or my courtroom deputy will reach out to you and

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    say, "Contact this magistrate judge and set up a settlement
 2    conference."
 3              I will ask you to try to do it in the next 60 days
 4    to see if we can make any headway in this case.  All right?
 5              So in the meantime, the Court -- this item will
 6    remain under submission until the Court issues its final
 7    order.  Thank you all for coming in, and have a good
 8    weekend.  All right?  Thank you.
 9              MS. DWIGHT:  Thank you, Your Honor.
10              THE CLERK:  All rise.  This Court is in recess.
11         (Proceedings concluded at 9:54 A.M.)
12                             --oOo--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE


    I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  July 28, 2022.




            _/S/ CHIA MEI JUI_____

            Chia Mei Jui, CSR No. 3287